**TEXANS AGAINST CENSORSHIP, INC., et al., Plaintiffs,**

v.

**STATE BAR OF TEXAS, James A. McCormack, and the District 1A Grievance Committee of the State Bar of Texas, Defendants.**

No. 3:94 cv 61.

United States District Court,
E.D. Texas,
Paris Division.

March 31, 1995.

Charles L. Babcock, Alan N. Greenspan, Susan L. Weiss, Dallas, TX, Ken Poland, Houston, TX, for plaintiffs.

Tracey Crawford, Michael A. Hatchell, Tyler, TX, James E. Coleman, Jr., George M. Kryder, Dallas, TX, Elizabeth D. Whitaker, David S. Coale, Dallas, TX, Russell H. McMains, Corpus Christi, TX, James M. McCormack, Austin, TX, for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge.

### I. Introduction

This civil action, brought pursuant to 42 U.S.C. § 1983, presents many complicated and thorny issues concerning whether regulations which restrict the manner in which lawyers licensed to practice law in Texas may advertise their services, or otherwise solicit business, abridge, *inter alia*, the right to freedom of expression under the First Amendment. The Supreme Court of Texas recently promulgated these regulations as amendments to the Texas Disciplinary Rules of Professional Conduct, and they are scheduled to become effective on April 1, 1995.

Plaintiff Texans Against Censorship, Inc. ("TAC"), is a nonprofit Texas corporation whose stated purpose is to inform the public on issues relating to attorney advertising and to oppose the adoption of regulations restricting the right of attorneys to advertise.

Plaintiffs Jim S. Adler, Wynne L. Creekmore, Jr., Charles Newton, Paul Weinstein, and J.M. (Mick) Bandy (the "individual plaintiffs") are attorneys licensed to practice law in the state of Texas.

As Texas lawyers, the professional conduct of the individual plaintiffs, as well as the attorney-members of TAC, is governed by the Texas Disciplinary Rules of Professional Conduct (the "Texas rules"). The individual plaintiffs have advertised their services, or otherwise solicited business in the past, and wish to continue advertising and soliciting in the future. They contend the amendments to the Texas rules will unconstitutionally interfere with their rights to engage in such advertising and solicitation.

The Supreme Court of Texas entered the order promulgating the amendments to the Texas rules on November 4, 1994, and plaintiffs filed this civil rights action on November 10, 1994. Motions for expedited discovery were granted, and this action proceeded at an accelerated pace. A hearing on defendants' motions to dismiss was conducted on January 5, 1995, and was denied on January 12, 1995. Trial commenced on January 30, 1995, and continued through February 3, 1995.[1]

Plaintiffs seek an adjudication from this court that the amended rules are, in whole or in part, unconstitutional, and an injunction prohibiting defendant the State Bar of Texas ("state bar"), defendant James M. McCormack, the Chief Disciplinary Counsel of the state bar, and defendant The District 1A Grievance Committee of the state bar from enforcing the amended rules.[2]

## II. Background

■ In Texas, the power to regulate the practice of law resides in the Supreme Court of Texas, and derives from both a statutory grant of power, *see* Tex.Govt.Code Ann. § 81.011(c) (Vernon 1988), and the Supreme Court of Texas' inherent judicial power. *See generally Eichelberger v. Eichelberger,* 582

S.W.2d 395, 397–98 & n. 1 (Tex.1979). In regulating the legal profession in the state, the Supreme Court of Texas has the responsibility of ensuring that Texas lawyers maintain appropriate standards of professionalism and responsibility. *See* Tex.R.Disciplinary P. preamble (1992), *reprinted in* Tex.Govt.Code Ann., tit. 2, subtit. G app. (Vernon Supp. 1995).

To discharge this responsibility, the Supreme Court of Texas and the state bar have worked in concert to develop appropriate regulations governing the professional conduct of Texas lawyers. In 1984, the state bar began actively evaluating the American Bar Association's model rules of professional conduct for possible adoption in Texas. *See* Schuwerk & Sutton, *A Guide to the Texas Disciplinary Rules of Professional Conduct,* 27A Hous.L.Rev. 1 (1990). In 1989, after an extensive drafting process, which involved numerous committees of the state bar, as well as comment by individual lawyers, the Texas Supreme Court adopted the Texas rules, which have been aptly described as a "Texanization" of the American Bar Association's model rules to fit the particular forms and styles of practice common in Texas. *See id.* at 1–7. The Texas rules became effective January 1, 1990, and have governed the professional conduct of attorneys licensed to practice law in Texas since that date. *See id.*

The Texas rules are mandates, that speak in terms of "shall" or "shall not." *See* Tex.Disciplinary R.Prof.Conduct preamble ¶ 10, *reprinted in* Tex.Govt.Code Ann., tit. 2, subtit. G app. (Vernon Supp.1995). A Texas lawyer who fails to conform his professional conduct to the Texas rules commits professional misconduct and may be suspended or disbarred from practice. *See* Tex.R.Disciplinary P. 1.06(Q) (defining "professional misconduct" as, *inter alia,* "[a]cts or omissions by an attorney, individually or in concert with another person or persons, that violate one or more of the Texas Disciplinary Rules of Professional Conduct"). As Chief Disci-

---

1. Counsel for both plaintiffs and defendants have submitted thorough and well-prepared briefs throughout the course of this litigation, which is especially praiseworthy given this lawsuit's hastened schedule.

2. At trial, a motion to bifurcate plaintiffs' claim for attorneys fees under 42 U.S.C. § 1988 was granted.

plinary Counsel of the state bar, defendant McCormack is responsible for enforcing and prosecuting violations of the Texas rules. *See* Tex.R.Disciplinary P. 5.02 (listing duties of Chief Disciplinary Counsel of the state bar). Although the Texas rules were adopted by the Supreme Court of Texas, and are not a product of the Texas legislature, the Supreme Court of Texas has determined that the Texas rules should be construed as statutes. *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 399 (Tex.1988).

Part VII of the Texas rules, entitled "information about legal services," regulates the manner in which Texas lawyers may advertise their services or otherwise solicit business. The version of part VII of the Texas rules adopted in 1990 restricts lawyer advertising and solicitations in several respects: lawyers are prevented from making false or misleading communications about their services or firm; lawyers may advertise their specialties in only limited ways; lawyers are required to disclose certain information, if the lawyer advertises that he or she practices in any area of the law; lawyers are prevented from sending written communications to prospective clients in certain circumstances; lawyers are forbidden from contacting certain potential clients in person or telephonically, when a significant motivation for the solicitation is the lawyer's desire for pecuniary gain; and lawyers may practice under only certain names. *See* Tex.Disciplinary R.Prof.Conduct 7.01–7.04. Defendants assert that the foregoing version of part VII needed amending, because it did not sufficiently protect Texas citizens from false or deceptive lawyer advertising and solicitation.

Apparently, the Texas legislature also had concerns with lawyer advertising and solicitation in the state. During the 1993 regular legislative session, the Texas legislature considered House Bill 2506 which, if passed, would have enacted substantially more restrictive regulations regarding legal advertis-ing and solicitations than existed in part VII of the Texas rules. The state bar reacted swiftly to what it perceived as a legislative encroachment on its sphere of concern, and members of the state bar, including Lonnie Morrison, Esquire, then the president-elect of the state bar, sought to convince the legislature that any problems concerning lawyer advertising were more appropriately addressed through the state bar's self-enforcement regime.

In conjunction with their lobbying efforts, members of the state bar began drafting more restrictive legal advertising and solicitation rules. Morrison produced the first draft, referred to as "draft A" during the trial of this action, and derived his product largely from the lawyer advertising rules already in existence, the rules under consideration in the Texas legislature, and similar rules in other states. Draft A was distributed to the Board of Directors of the state bar at its April 1993, meeting. Still concerned about potential legal advertising legislation, the board of directors of the state bar created the "Special Committee on Lawyer Advertising," whose purpose was to put the finishing touches on part VII of the Texas rules, and thereby assuage any doubts the legislature might have as to the state bar's commitment to reforming the legal advertising rules.[3]

The Special Committee on Lawyer Advertising, utilizing draft A as a roughcast, embarked on a hastened factfinding process to determine what changes to the legal advertising rules were needed, and what changes were appropriate. It conducted public hearings in eight Texas cities,[4] substantially modified Draft A in several additional drafts, and consulted with John F. Sutton, Jr., formerly the Dean of the University of Texas School of Law, concerning the wording and constitutionality of the proposed amendments to the

---

**3.** Prior to the creation of this "special" committee, there existed a "standing" committee on lawyer advertising. According to Morrison's testimony, the standing committee on lawyer advertising focused on developing programs on lawyer advertising, but was not involved in the creation of the amendments to part VII of the Texas rules.

**4.** Hearings were held in Lubbock, Tyler, Houston, Dallas, El Paso, San Antonio, Austin, and Brownsville. Plaintiff Jim S. Adler spoke at both the Dallas and Houston hearings. Transcripts from each of the eight hearings were admitted in evidence during the trial of this action.

Texas Rules.[5] After the public hearings, the special committee, as well as its individual members, received numerous comments and criticisms, from both within and without the legal profession. The special committee also reviewed various suggestions contained in decisions of the United States Supreme Court as to how lawyer advertising and solicitation might be lawfully regulated.

Apparently, the state bar's efforts persuaded the Texas legislature not to enact the legal advertising legislation, and the 1993 regular legislative session ended without a vote on the legislation. The Texas legislature, however, instructed the state bar to adopt rules and regulations regarding legal advertising and solicitation by June 1, 1994.[6]

The Special Committee completed its work on the proposed amendments and submitted them to the board of directors of the state bar in June 1993. The board approved the proposed rules, and it authorized Morrison to submit them to the Supreme Court of Texas for a referendum of the state bar's members pursuant to the State Bar Act, Tex. Govt.Code Ann. § 81.024 (Vernon 1988). Before Morrison could do this, however, the Supreme Court of Texas recessed. Taking advantage of the additional time, Morrison and other state bar members reworked the proposed rules slightly, and then submitted them to the state bar's board of directors again in September 1993. The board of directors approved the slightly altered proposed amendments, and authorized their submission to the Supreme Court of Texas for a referendum.

The Supreme Court of Texas approved the referendum, and it was conducted between November 19, 1993, and December 20, 1993. Less than fifty-one percent of the membership of the state bar participated in the referendum, however, and the proposed amend- ments could not be promulgated. *See* Tex. Govt.Code Ann. § 81.024(d) (Vernon 1988).

Undaunted, the state bar re-approached the Supreme Court of Texas in January 1994, seeking authorization for a second referendum on the proposed amendments to the Texas rules. TAC filed a brief in the Texas high court, opposing the state bar's petition for a second referendum. The Supreme Court of Texas held a hearing on the propriety of a second referendum, at which both Morrison, on behalf of the state bar, and counsel for TAC presented argument to the Court. Ultimately, the Supreme Court of Texas authorized the second referendum by a five to four vote.

Unlike the first referendum, however, the second referendum was conducted in conjunction with the election of the state bar's officers. In addition, one of the amended rules, which was thought to be more controversial than the other proposed amendments, was submitted on a separate ballot. *See Referendum '94,* 57 Tex.B.J. 3, 265 (1994). The second referendum was held between April 14, 1994, and May 16, 1994. Over fifty-one percent of the state bar membership participated, and the proposed amendments on each of the ballots were approved.

TAC then submitted several briefs to the Supreme Court of Texas, arguing that the amendments were unconstitutional and should not be promulgated. In response to these arguments, the Supreme Court of Texas modified the approved amendments slightly, and then promulgated that version of the amendments.[7] As previously stated, these rules will become effective on April 1, 1995.

### III. The Amended Rules

The amendments to the part VII of the Texas rules approved by the membership of

---

**5.** Dean Sutton's extensive involvement with the state bar in the development of rules regulating the professional conduct of Texas lawyers is noteworthy. *See* Schuwerk & Sutton, *A Guide to the Texas Disciplinary Rules of Professional Conduct,* 27A Hous.L.Rev. 1 (1990).

**6.** *See* Act effective June 17, 1993, Tex.S.B. 1227, § 7, 73rd Leg., R.S.1993 (this instruction was attached to legislation amending the Texas barratry statute, Tex.Penal Code § 38.12). Aspects of

this legislation were enjoined as unconstitutional in *Moore v. Morales,* 843 F.Supp. 1124 (S.D.Tex. 1994) (appeal filed).

**7.** Two justices dissented on the grounds that the rules being promulgated contained changes that had not been considered by the members of the state bar in the referendum. *See* Ord.Sup.Ct. of Tex., Misc. No. 94–9167 (Nov. 4, 1994) (Spector, J., dissenting).

the state bar, and promulgated by the Supreme Court of Texas (the "amended rules"), comprehensively regulate legal advertising and solicitations. They completely replace part VII of the Texas rules, even though some of the rules promulgated by the Supreme Court of Texas replicate rules previously in effect.[8]

Part VII of the Texas rules is divided into seven broad rules. Amended rule 7.01 regulates the names under which a Texas lawyer, or law firm, may practice. Amended rule 7.02 prohibits Texas lawyers from making false or misleading communications about any lawyer or law firm, and lists five categories of communications which are defined as false or misleading. Amended rule 7.03 limits a Texas lawyer's ability to seek professional employment through in-person or telephone contact. Amended rule 7.04 comprehensively regulates the manner in which Texas lawyers may advertise in the public media. Amended rule 7.05 regulates Texas lawyers' written solicitation communications. Amended rule 7.06 prohibits a Texas lawyer from accepting employment when he or she knows, or reasonably should know, that the person seeking the lawyer's services does so as a result of a violation of the Texas rules. Finally, amended rule 7.07 creates a filing requirement with which Texas lawyers must comply when they advertise or distribute written solicitation communications, and establishes a prescreening procedure whereby Texas lawyers may obtain an advance advisory opinion concerning the lawfulness of their proposed advertisement or solicitation. In addition, the Supreme Court of Texas promulgated amended rule 8.05, which explicates the jurisdiction of the disciplinary authority over Texas lawyers, and amended rule 9.01, making the provisions of the Texas rules severable.

In connection to the promulgation of the amended rules, a new permanent committee of the state bar was created. The "Lawyer Advertising and Solicitation Review Committee" (the "Review Committee") is deputed to receive and file copies of advertisements and solicitations that must be filed under the terms of amended rule 7.07. The Review Committee is also responsible for issuing advance advisory opinions on the lawfulness of advertisements or solicitations that are submitted for a prescreening review. In addition, the amended rules provide that the Review Committee can require Texas lawyers to substantiate representations made in their advertisements or solicitations.[9]

## IV. Plaintiffs' Claims

Plaintiffs challenge the amended rules on several different levels, and rely on a profusion of constitutional doctrines to attack their validity. The amended complaint states:

> Plaintiffs seek a declaration from this Court that the Amended Rules are, in whole, or in part, unconstitutional under both the federal and Texas constitutions. In particular, the Amended Rules violate the free speech rights guaranteed by the federal and Texas constitutions because they are unconstitutionally overbroad, void for vagueness, and ambiguous, are facially unconstitutional, and are unconstitutional as applied to the Attorneys. The Amended Rules also violate the equal protection provisions of the Texas and federal constitutions because they unequally apply to the speech of certain entities, organization, types of organizations, individuals, and types of individuals.... [T]he Amended Rules in conjunction with other disciplinary rules, act as a prior restraint on constitutionally protected speech and the system of enforcement is without constitutionally required procedural safeguards....

Pla.'s First Amd.Compl., Dec. 5, 1994, at ¶ 31. In sum, plaintiffs allege the amended rules violate the First Amendment in regard to the following: they apply unconstitutionally to plaintiffs' commercial speech; they ap-

---

**8.** Morrison testified at trial that he and other state bar officials felt it would be advantageous to submit an entirely reorganized part VII to the state bar's membership, as opposed to a random collection of amendments to various rules, since the regulatory scheme could be more easily understood in that context.

**9.** The amended rules were admitted into evidence as Pla.s' Ex. 1, and the comments to the amended rules were admitted into evidence as Def.s' Ex. 215.

ply unconstitutionally to plaintiffs' noncommercial speech; they are unconstitutionally overbroad; they are unconstitutionally vague; and, finally, they act as an unconstitutional prior restraint on speech.

Plaintiffs also contend certain provisions of the amended rules violate the Equal Protection clause of the Fourteenth Amendment, since they apply unequally to different categories of lawyers or organizations. *See* Jt.Final Pretrial Ord., at 4. However, plaintiffs have failed to pursue these claims. Scant, if any, evidence was presented at trial to show that any classifications created by the amended rules violate equal protection principles, and plaintiffs completely ignore their equal protection claims in their lengthy post-trial briefs. Nonetheless, plaintiffs' equal protection claims will be briefly addressed below.

At the trial of this action, Plaintiffs made it clear that their attacks on the amended rules are both global and selective; that is, they seek to have the amended rules declared unconstitutional *en masse*, or, alternatively, rule-by-rule. In relation to their argument that the amended rules should be declared unconstitutional as a whole, plaintiffs contend that the amended rules create a regulatory scheme that is so burdensome as to unconstitutionally hamper the freedom of expression protected by the First Amendment; that they are substantially overbroad in their application to noncommercial speech; and that several undefined terms used in the amended rules are so vague and ambiguous as to unconstitutionally deprive Texas lawyers of any warning as to what expressive conduct may be illegal under their provisions.

Plaintiffs spell out their challenges to individual rules in a document entitled, "Plaintiffs' Objections to the Amended Rules," which was admitted into evidence during trial as defendants' exhibit 334. Plaintiffs drafted this document in response to the court's request that plaintiffs specify which of the amended rules were truly at issue in this action. The document lists several provisions of the amended rules to which plaintiffs have no objection.

Defendants relied on this document when they moved, pursuant to Fed.R.Civ.P. 52(c), for the entry of judgment as a matter of law at the conclusion of plaintiffs' case in chief. Defendants argued that no issue was presented as to the provisions of the amended rules to which plaintiffs indicated they had no objection; thus, they maintained that judgment should be granted regarding those provisions. Counsel for plaintiffs opposed this motion, and asserted that challenges to all the amended rules were preserved in their "general objections" to the entirety of the amended rules.

Defendants' motion for judgment as a matter of law, pursuant to Fed.R.Civ.P. 52(c), was denied on the basis that plaintiffs were challenging each and every provision of the amended rules, insofar as their global attacks were concerned. It is therefore found that the constitutionality of the specific provisions to which plaintiffs have stated they have no objection is not in issue, other than in relation to plaintiffs' integrated argument that the amended rules are, as a whole, unconstitutional. Accordingly, those provisions will not be individually considered.

## V. Justiciability

### A. Ripeness

Defendants argue that this action is not ripe for adjudication, because, despite the Supreme Court of Texas' promulgation of the amended rules, they are not currently in effect. This is essentially the same argument defendants made in connection with their motion to dismiss, and which was rejected. *See* Mem.Op., Jan. 12, 1995. As defendants have failed to provide the court with fresh argument or authority in regards to ripeness, the issue will not be reexamined. For the reasons set forth in the memorandum opinion denying defendants' motion to dismiss, plaintiffs' claims are found ripe for adjudication.

### B. Standing

In addition, defendants contend that both the individual plaintiffs and TAC lack standing to bring all or some of their claims. Article III of the Constitution limits the judicial power of the United States to the resolution of "cases" and "controversies." A liti-

gant has standing to pursue a case or controversy under Article III, when the litigant shows a "personal injury fairly traceable to the ... allegedly unlawful conduct and likely to be redressed by the requested relief." *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) ("at an irreducible minimum, article III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant....") (quotation omitted). Here, in the context of an action for declaratory judgment, the facts must demonstrate "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969) (citation omitted).

### 1. Standing of the Individual Plaintiffs

■ Each of the individual plaintiffs, except for plaintiff Wynne L. Creekmore,[10] testified that he has previously engaged in conduct that would be prohibited or heavily regulated under some of the amended rules, and that he wishes to continue in such conduct after the amended rules become effective. However, several provisions of the amended rules proscribe conduct that no plaintiff testified to having previously engaged in, or to having a desire to engage in, in the future.

With respect to the amended rules that will actually affect the individual plaintiffs, the parties have stipulated that "with the promulgation of the amended rules, McCormack, the Review Committee, and the state bar grievance committees will begin to enforce the amended rules." *See* Joint Fin.Pretrial Ord., Jan. 26, 1995, at ¶ 28. Thus, as attorneys licensed to practice law in Texas, the individual plaintiffs must conform their conduct to the provisions of the amend-

ed rules the moment they become effective. If they do not, it is highly likely that they will be sanctioned.

The Supreme Court has determined that litigants facing similar predicaments have standing. In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court held that Georgia doctors had standing to pursue challenges to the constitutionality of state abortion laws before their enforcement, despite the fact that the doctors had never been threatened with prosecution under the Georgia laws:

> The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet that statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

*Id.* at 188, 93 S.Ct. at 745. Similarly, in *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Court held that a teacher need not risk arrest and prosecution prior to seeking a judicial pronouncement that the state's anti-evolution statute was unconstitutional. In *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), the Court stated that a plaintiff need not chance arrest and prosecution prior to filing suit, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder ..." *Id.* at 298, 99 S.Ct. at 2309.[11] Plaintiffs should not be forced to risk possible ouster from their chosen profession, in order to challenge rules they contend will infringe upon their constitutional rights by regulating conduct they have previously engaged in, and wish to continue engaging in. *See Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974) ("It is not necessary that

**10.** Plaintiff Creekmore did not testify.

**11.** The Supreme Court has previously ruled that disciplinary proceedings against attorneys are

quasi-criminal in nature. *In re Ruffalo*, 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (1968).

[the attorney-plaintiffs] first expose [themselves] to actual arrest or prosecution to be entitled to challenge a statute that [they] claim deters the exercise of [their] constitutional rights."). Hence, the individual plaintiffs have demonstrated a sufficient threat of injury from the amended rules to warrant the exercise of jurisdiction over their challenges to the provisions of the amended rules that will actually affect their conduct. *See Spencer v. Honorable Justices of Supreme Court of Pennsylvania,* 579 F.Supp. 880, 883–84 (E.D.Pa.1984), *aff'd,* 760 F.2d 261 (3d Cir.1985) (finding Pennsylvania lawyer had sufficient personal stake in outcome of litigation to confer standing to challenge constitutionality of state bar rules without having to undergo disciplinary action); *Durham v. Brock,* 498 F.Supp. 213, 216–17 (M.D.Tenn. 1980), *aff'd,* 698 F.2d 1218 (6th Cir.1982) (same).

The same cannot be said, however, for the individual plaintiffs' challenges to the provisions of the amended rules that will have no effect whatsoever on their conduct. *See Madsen v. Women's Health Center, Inc.,* ——— U.S. ———, ———, 114 S.Ct. 2516, 2530, 129 L.Ed.2d 593 (1994) (finding plaintiffs lacked standing to challenge portion of injunction that did not apply to them). There was no testimony from plaintiffs that they desired to practice under a trade name, as prohibited by amended rule 7.01;[12] that they desire to include comparisons of their services with other lawyers' services in their advertisements or others solicitations, as prohibited by amended rule 7.02(a)(3); that they desired to advertise in the public media as part of an advertising cooperative or venture as regulated by amended rule 7.04(*o* ), or that they desired to distribute written solicitation letters by registered mail, or by other manner requiring personal delivery, to the communication's recipient, as prohibited by amended rule 7.05(b)(5). Since the individual plaintiffs have not indicated any credible intention of engaging in conduct that would be proscribed by these particular provisions, their claims

that these rules violate the Constitution amount to only generalized grievances. Accordingly, it is found that the individual plaintiffs lack standing to challenge amended rules 7.01, 7.02(a)(3), 7.04(*o* ), and 7.05(b)(5).

### 2. Standing of TAC

■ TAC is a corporation, and thus is not subject to the provisions of the amended rules itself. However, TAC is also a consumer of legal services. The Supreme Court has determined that consumers have a constitutional right to receive advertising protected by the First Amendment. *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976). Accordingly, TAC has standing to challenge the amended rules, including the provisions the individual plaintiffs lack standing to challenge, on its own behalf.

■ TAC also has standing to assert the rights of its members, at least insofar as it brings facial challenges to the amended rules. An organization has standing to assert the claims of its members, provided:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). TAC clearly satisfies (a) and (b), since it has been determined that plaintiff Jim S. Adler, a member of TAC, has standing to sue on his own behalf, and since TAC's stated purpose, to oppose the adoption of restrictions on legal advertising, is germane to the constitutional interests TAC seeks to protect in this action. In addition, TAC fulfills the third requirement of representative standing, in that neither the facial claims asserted, nor the prospective relief sought, require the participation of TAC's individual members.[13]

---

**12.** Plaintiff Charles Newton practices under the name, "Newton & Newton, The Legal Group." This does not appear to be a trade name which would be prohibited by the amended rules.

**13.** It may be true that TAC lacks standing to pursue as-applied challenges to the amended rules on behalf of its members, since those claims require a showing of how the amended rules apply to attorney advertising and solicita-

## C. Exhaustion of State Remedies

■ Defendants also contend that "principles of comity, abstention, exhaustion of administrative and state remedies are violated" by reason of the fact that "plaintiffs have challenged rules that, in identical or substantially similar form, have been in effect for years, without seeking redress or without notice to the Texas Supreme Court, the promulgator of the rules." *See* Joint Fin.Pretrial Ord., at p. 6. Apparently, defendants' argument is that, whereas the Supreme Court of Texas finally settled the constitutionality of the amended rules under the Texas Constitution when they promulgated them, the Court did not consider the constitutionality of the amended rules under the United States Constitution, and thus plaintiffs' claims should be presented to a Texas court prior to federal court consideration. *See* Jt.Final Pretrial Ord., at 6.

■ Plaintiffs in federal actions brought pursuant to 42 U.S.C. § 1983 are generally not required to exhaust state administrative or judicial remedies prior to bringing suit. *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (administrative remedies); *Zinermon v. Burch*, 494 U.S. 113, 123–26, 110 S.Ct. 975, 982–83, 108 L.Ed.2d 100 (1990) (judicial remedies). Hence, contrary to defendants' contention, plaintiffs were not required to present their claims to a Texas court prior to instigating this action.

In addition, it can be presumed the Supreme Court of Texas previously considered the constitutional claims plaintiffs now raise. The amended rules were not issued without deliberation. Prior to their promulgation, TAC and the state bar presented several briefs to the Supreme Court of Texas regarding the constitutionality of the amended rules under both the Texas Constitution and the

United States Constitution. *See* Def.s' Ex.s 253–58. Ultimately, the Supreme Court of Texas modified the amended rules somewhat before promulgating them. It thus appears the Supreme Court of Texas examined the constitutionality of the amended rules under both the Texas Constitution and the United States Constitution before putting them in operation. Presumably, the changes made were designed to cure any deficiencies the Court found.[14] Accordingly, it is found that the Supreme Court of Texas has finally ruled on the constitutionality of the amended rules.

## VI. First Amendment Analysis

Because this action presents a justiciable controversy, the merits of plaintiffs' claims that the amended rules are unconstitutional must be addressed. Plaintiffs go to great lengths in attempting to establish that the amended rules implicate noncommercial or core speech, and thus invoke the constitutional standards applicable to fully protected expression. Such effort is understandable, in consideration of the fact that the protection afforded noncommercial expression is considerably more extensive than the "limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978), afforded purely commercial communications.

## A. Do the Amended Rules Reach Noncommercial Speech?

■ As has been noted, plaintiffs contend the amended rules unconstitutionally apply to both their commercial and their noncommercial expression, and are substantially overbroad in application to the noncommercial speech activities of persons not before the court.[15] Defendants argue that the amended rules implicate only commercial speech, and

---

tion. However, that issue is largely academic, as the individual plaintiffs, and TAC on its own behalf, have standing to pursue those claims.

**14.** The Supreme Court of Texas has expressly recognized its duty to follow the strictures of the United States Constitution. *See Eichelberger*, 582 S.W.2d at 397 (The Supreme Court of Texas "must recognize and follow the supreme law of the land").

**15.** Plaintiffs may utilize the overbreadth doctrine only to the extent the amended rules are found to reach noncommercial speech. *Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 481, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989).

that any noncommercial speech plaintiffs wish to engage in is not covered by the amended rules.

The Supreme Court has defined commercial speech as speech whose purpose is to "propose a commercial transaction," *City of Cincinnati v. Discovery Network, Inc.,* — U.S. —, —–—, 113 S.Ct. 1505, 1512–13, 123 L.Ed.2d 99 (1993); *Board of Trustees of the State Univ. of New York v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989), or, more broadly, as speech "related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980); *In re R.M.J.,* 455 U.S. 191, 204 n. 17, 102 S.Ct. 929, 938 n. 17, 71 L.Ed.2d 64 (1982); *see also Discovery Network, Inc.,* — U.S. at —–—, 113 S.Ct. at 1512–13 (discussing these two definitions of commercial speech). It is clear, for instance, that communication of the message, "I will sell you the X prescription drug at the Y price," is commercial speech, since it is speech which proposes a commercial transaction. *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). But, it has been observed that the exact dividing line between commercial and noncommercial expression is not always easily ascertainable. *See Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 81, 103 S.Ct. 2875, 2888, 77 L.Ed.2d 469 (1983) (Stevens, J. concurring in the judgment) (commenting that "the impression that 'commercial speech' is a fairly definite category of communication ... may not be wholly warranted."); *see also* Shiffrin, *The First Amendment and Economic Regulation: Away From a General Theory of the First Amendment,* 78 Nw.L.Rev. 1212, 1229 (1983) (noting situations where commercial and noncommercial speech are difficult to distinguish).

### 1. Does the Language of the Amended Rules Encompass Noncommercial Speech?

Plaintiffs contend the amended rules, by their own terms, regulate lawyer advertisements and solicitation communications which are noncommercial speech. The amended rules, however, cannot be read to sweep so broadly.

Initially, cognizance should be taken that the amended rules are a part of a body of rules designed to govern the practice of law. *See* Tex.Disciplinary R.Prof.Conduct preamble. The title of the amended rules, "information about legal services," and the repeated references to "practice," "services," and "professional employment" contained in the amended rules bespeak the amended rules' focus on the commercial nature of the legal profession. While Texas lawyers may speak in many different capacities, *e.g.,* as teachers, journalists, television commentators, or interested citizens, the amended rules, by their own terms, have no application when a lawyer speaks outside the context of the legal profession.

Second, the specific language used in the amended rules demonstrates that they apply only to communications which propose a commercial transaction. The provisions of the amended rules become applicable, when a lawyer "advertises in the public media," *see* amended rule 7.04, sends "a written solicitation communication," *see* amended rule 7.05, or "communicates concerning a lawyer's services," *see* amended rule 7.02. The Supreme Court has consistently regarded regulations aimed at a professional's "advertisements" or "solicitations" as implicating only commercial speech. *See Edenfield v. Fane,* — U.S. —, —, 113 S.Ct. 1792, 1797, 123 L.Ed.2d 543 (1993) (certified public accountant's "solicitations" are commercial speech); *Peel v. Attorney Reg. & Disciplinary Comm'n,* 496 U.S. 91, 99–100, 110 S.Ct. 2281, 2287, 110 L.Ed.2d 83 (1990) (lawyer's advertisement as certified trial specialist is commercial speech); *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 472, 108 S.Ct. 1916, 1921, 100 L.Ed.2d 475 (1988) ("Lawyer advertising is in the category of constitutionally protected commercial speech"); *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 637, 105 S.Ct. 2265, 2274, 85 L.Ed.2d 652 (1985) ("it is clear enough that the speech at issue in this case—advertising pure and simple—falls within the [bounds of commercial speech].").

The use of the phrase "communications about a lawyer's services or qualifications" in amended rule 7.02, however, is more troublesome, and might be interpreted as encompassing noncommercial speech. Notwithstanding, the comments to that rule make clear that it, as well as the other amended rules, apply *only* to commercial speech:

> The rules within part VII are intended to regulate communications made for the purposes of obtaining professional employment. They are not intended to affect other forms of speech by lawyers, such as political advertisements or political commentary, except insofar as a lawyer's effort to obtain employment is linked to a matter of current public debate"

*See* Amended rule 7.02 cmt. 1.[16] This language makes it abundantly plain that only a Texas lawyer's communication made for the purpose of obtaining professional employment falls within the ambit of the amended rules. Because employing a lawyer is one type of commercial transaction, the amended rules must be understood to regulate only those communications made for the purpose of proposing a commercial transaction.

**2. Despite the language used in the amended rules, does the evidence establish that the amended rules apply to plaintiffs' noncommercial speech?**

Plaintiffs contend the evidence presented at trial conclusively establishes that various of their newsletters, public service announcements, political campaign advertisements,[17] and even messages posted on computer bulletin boards, constitute noncommercial speech subject to the amended rules. Defendants, on the other hand, assert that the amended rules regulate only lawyer communications, advertisements, or solicitations which propose a commercial transaction.

■ Plaintiffs point to an advertisement plaintiff Jim S. Adler ("Adler") published in the *Pasadena Citizen*, which related to whether the current system of electing state judges in Texas should be changed, as noncommercial speech covered by the amended rules.[18] Plaintiffs assert that this advertisement falls within the amended rules, because Morrison testified that he believed it was a commercial communication subject to the amended rules.

Plainly, the *Pasadena Citizen* advertisement does not propose a commercial transaction, *see New York Times v. Sullivan*, 376 U.S. 254, 265–66, 84 S.Ct. 710, 718–19, 11 L.Ed.2d 686 (1964) (finding that paid advertisement published in *New York Times* was not a "commercial" advertisement); and the amended rules must be understood to reach some noncommercial speech if Morrison is correct in his assumption that this type of advertisement is covered by them.

Morrison's opinion that this advertisement falls within the purview of the amended rules, however, is neither controlling nor conclusive.[19] Morrison based his opinion on

---

**16.** The comments to the amended rules "explain applications of the rules, in order to provide guidance for interpreting the rules and for practicing in compliance with the spirit of the rules." *See* Tex.Disciplinary R.Prof.Conduct preamble ¶ 10.

**17.** Plaintiffs' argument that the amended rules regulate political advertisements is meritless. The comments to the amended rules explicitly exclude political advertisements from the amended rules. *See* Amended Rule 7.02 cmt. 1. Moreover, plaintiffs' contention that the amended rules apply to a lawyer's political advertisements for judicial office is not meritorious. Those communications are covered in an entirely different set of rules. *See* Tex.Code Jud.Conduct, Canon 5, *reprinted in,* Tex.Govt.Code Ann. tit. 2, subtit. G app. B (Vernon Supp.1995).

**18.** The advertisement reads:

> Some Judges should be appointed and some elected. Members of the Texas Supreme Court, Texas Court of Criminal Appeals and appellate Courts should be chosen by the Governor and confirmed by the Senate. Appointed judges should seek voter approval every two years. State district judges should be elected in non-partisan elections. A constitutional amendment will be required to change the current judicial selection process. Let Me Know Your Thoughts! ... Paid for by Jim S. Adler, Attorney. Concerned about Judicial Reform. (Not Board Certified by the Texas Board of Legal Specialization).

*See* Pla.s' Ex. 148.

**19.** It is interesting to observe that plaintiffs rely on Morrison's opinion to establish that this advertisement is subject to the amended rules, but strongly contest the propriety of Morrison testifying as to other legal opinions. *See* Pla.s' Brief

Adler's testimony that the advertisement was published with hopes that subscribers of the *Pasadena Citizen* would read the advertisement and hire him.[20] Although Adler admitted that he hoped to generate business by publishing it, the advertisement itself cannot be said to propose a commercial transaction. It appears obvious that anyone reading this advertisement, without knowledge that Adler published it with the specific intent of obtaining clients, would not likely think it was published for the purpose of obtaining professional employment. At most, the advertisement suggests that "Jim S. Adler, attorney," would like to hear what subscribers of the *Pasadena Citizen* think about reforming the judicial selection process in Texas. Accordingly, Adler's advertisement must be understood to be noncommercial speech, and neither the state bar, nor any other governmental body, may regulate such speech, except in extraordinary circumstances. *See Bolger*, 463 U.S. at 65, 103 S.Ct. at 2879 ("With respect to noncommercial speech, this Court has sustained content based restrictions only in the most extraordinary circumstances") (footnote omitted).

But, since the advertisement itself does not propose the professional employment, Morrison's conclusion that Adler's advertisement is subject to the amended rules is erroneous. Certainly, Texas lawyers who attempt to attract clients by distributing newsletters, public service announcements, or other forms of advertisement and solicitation of the nature of the *Pasadena Citizen* advertisement may do so with hopes of marketing their services or otherwise achieving pecuniary gain. It is not their desire to make money, however, which will bring these newsletters, announcements, or solicitations within the provisions of the amended rules. Instead, it is only when the message conveyed by the communication suggests to the public, or a specific individual, that the lawyer's professional services are available for hire that the communication must meet the requirements of the amended rules. Plaintiff Adler's *Pasadena Citizen* advertisement simply does not contain such a suggestion, and hence it is not covered by the amended rules.

### 3. Do the amended rules regulate speech based solely on a lawyer's desire for pecuniary gain?

Plaintiffs also take the position that the sole criterion determining the applicability of the amended rules is a lawyer's desire for pecuniary gain. See Pla.s' Resp. to Def.s' Posttrial Submission, Feb. 28, 1995, at 3. Plaintiffs correctly point out that economic motivation, alone, is not sufficient to transform otherwise noncommercial speech into commercial expression. *See Fox*, 492 U.S. at 482, 109 S.Ct. at 3036 ("Some of our most valued forms of fully protected speech are uttered for a profit"); *Bolger*, 463 U.S. at 67, 103 S.Ct. at 2880 ("the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech"). Nevertheless, economic motivation is not totally irrelevant to the determination of whether speech is commercial or noncommercial. *See In re Primus*, 436 U.S. 412, 422, 98 S.Ct. 1893, 1899–1900, 56 L.Ed.2d 417 (1978) (distinguishing solicitation for purpose of providing free legal services with solicitations made to achieve pecuniary gain). Manifestly, one reason lawyers propose commercial transactions in their advertisements is to make money.

While plaintiffs are correct that several provisions of the amended rules concern a lawyer's desire for pecuniary gain, *see* amended rules 7.02 cmt. 1, 7.03, 7.05(d)(3), 7.05(e), 7.07(d), such profit motivation is not the *sine qua non* of the amended rules.

---

Concerning Admissibility of Legal Opinions, Jan. 27, 1995.

**20.** Adler's testimony in relation to this advertisement was somewhat equivocal:

[Questions by Mr. Babcock, counsel for plaintiffs]
 Q: All right, sir. Does this ad in your mind propose a commercial transaction?
 A: Well, I think it could. It does.

 Q: All right. And what—how does it propose a commercial transaction?
 A: Well, I think it—any client who agreed with my thoughts I hope they would call me, possibly hire me.
 Q: Okay. Just because you're a good guy concerned about the judiciary?
 A: Well, I think so.

For example, plaintiffs argue that amended rule 7.07 regulates speech based on a lawyer's desire for pecuniary gain. They base this contention on the wording of amended rule 7.07(d)(7), which exempts from the filing requirements imposed by the rule, a written solicitation communication if the lawyer's use of the communication to secure professional employment was not significantly motivated by a desire for, or by the possibility of obtaining, pecuniary gain.

Contrary to plaintiffs' postulation, however, the primary focus of amended rule 7.07 is not economic motivation. Rather, the filing requirements and the exemptions contained in this rule, as with all of the amended rules, operate only on an attorney's advertisement, solicitation, or newsletter that is distributed for the purpose of obtaining professional employment. Again, such an advertisement, newsletter, or solicitation is commercial speech.

**4. Do the amended rules regulate "inextricably intertwined" commercial and noncommercial speech?**

Finally, plaintiffs argue that pure speech is "inextricably intertwined" with commercial speech in their newsletters, advertisements, and public service announcements, and, consequently, the amended rules reach noncommercial speech. In *Riley v. Nat'l Fed. of the Blind of North Carolina,* 487 U.S. 781, 796, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988), the Supreme Court held that where "the component parts of single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Therefore we apply our test for fully protected expression."

The Court elaborated on this facet of First Amendment jurisprudence in *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). In *Fox,* the Supreme Court reviewed challenges brought by several students at the State University of New York to a school regulation that prevented

commercial enterprises from operating on state university campuses, except under certain circumstances. The students claimed the regulation violated their rights to noncommercial speech, because it prevented them from holding "Tupperware parties" on campus. At these gatherings, commercial enterprisers would, in addition to promoting their houseware products, discuss issues such as "how to be financially responsible and how to run an efficient home." *Id.* at 472–74, 109 S.Ct. at 3030–31. Relying on *Riley,* the students argued that their First Amendment claims should be reviewed under the standards applicable to fully protected speech, for the reason that the commercial and noncommercial aspects of the "Tupperware parties" were inextricably intertwined.

The Supreme Court disagreed:

> Including these home economic elements no more converted [the commercial enterprise's] presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech.... Communications can constitute commercial speech notwithstanding the fact that they contain discussions of important public issues.... We have made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.

*Id.* at 474–75, 109 S.Ct. at 3031–32 (internal quotations and citations omitted).

■ Plaintiffs maintain that certain newsletters distributed by plaintiff Adler contain "inextricably intertwined" commercial and noncommercial speech. *See* Pla.s' Ex. 140. These newsletters, entitled "StraightTalk," begin with the phrase, "A Message from Attorney Adler ...," and are followed by several pages of articles relating to consumer and public safety.[21] The last page of each of these newsletters contains the following language:

---

**21.** Adler testified that he does not write the articles himself, but purchases them from an out of state company.

**TELL YOUR FRIENDS ABOUT US**

No one expects them, but accidents do happen. If someone you know has been injured, we can help. At the Law Offices of Jim S. Adler, we've helped thousands of people get compensated for their injuries. Please give our toll free number to someone who might need our services.... We thank you for your past support and are ready to help you again.

See Pla.s' Ex. 140.

The noncommercial and commercial speech contained in Adler's newsletters cannot be considered inextricably intertwined. Though these newsletters contain articles relating to public health and safety, and thus contain speech that unquestionably would be fully protected in other contexts, the thrust of the newsletters is to inform its recipients that Attorney Adler and his firm are lawyers who might be able to help injured persons. In addition, nothing would prevent Adler from distributing the noncommercial information contained in the newsletters separately from the commercial information. *See Fox,* 492 U.S. at 474, 109 S.Ct. at 3031 (commercial and noncommercial aspects of presentation were not "inextricably intertwined," because "[n]o law of man or of nature makes it impossible to sell housewares without teaching home economics"). Though the newsletters link advertisements of "attorney Adler's" services to issues of public concern, the Supreme Court has determined that linking commercial speech to issues of public concern does not convert otherwise commercial expression into noncommercial speech. *See Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 66–67 & n. 13, 103 S.Ct. 2875, 2880 & n. 13, 77 L.Ed.2d 469 (finding that drugstore's mass mailings, entitled "Condoms and Human Sexuality" and "Plain Talk About Venereal Disease" were commercial speech). Taken as a whole, Adler's newsletters are commercial communications. The amended rules, then, must be understood to apply only to a Texas lawyer's advertisements, solicitations, or communications which propose a commercial transaction.

It is conceivable, of course, that the amended rules might be applied beyond their intended scope, and reach Texas lawyers' noncommercial expression. It would be inappropriate, however, to interpret the amended rules as sweeping so broadly, prior to the time when those given the charge of enforcing the amended rules have had the opportunity of construing the rules themselves. Clearly, nothing would preclude a Texas lawyer erroneously sanctioned under the Texas rules for speaking noncommercially from arguing that the sanction violates the First Amendment standards applicable to fully protected speech. It is concluded, therefore, that the amended rules must be analyzed under the guidelines pertinent to commercial speech.

## B. Do the Amended Rules Violate the First Amendment Right to Speak Commercially?

It is now beyond question that legal advertising or solicitation is a form of commercial speech entitled to protection under the First Amendment. Justice Blackmun, writing for the Court in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), explained the reasons for extending protection to commercial expression:

> The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. In short, such speech serves individual and societal interests in assuring informed and reliable decisionmaking.

*Id.* at 364, 97 S.Ct. at 2699 (internal citations omitted).

The Supreme Court has developed certain tests for analyzing regulations of commercial speech. Commercial speech that is false, misleading, or concerns an unlawful transaction, which adds nothing to, and actually taints the "marketplace of ideas," may be prohibited altogether. *See*

*Ibanez v. Florida Dept. of Bus. & Pro. Regulation,* —— U.S. ——, ——, 114 S.Ct. 2084, 2088, 129 L.Ed.2d 118 (1994); *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985). The state retains the ability to regulate truthful, nonmisleading speech that does not concern an unlawful transaction; but the state may restrict such commercial speech, only if "the government's interest in doing so is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than necessary to serve that interest." *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986) (citing *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980)).

In *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Court explained that the last criterion does not require the regulation to be the least restrictive means available to accomplish the government's purpose, but, rather, only a reasonable fit between the two must be shown. *Id.* at 480, 109 S.Ct. at 3034–35; *see also Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (regulation must be in "reasonable proportion to the interest served").

The amended rules challenged by plaintiffs in this action primarily regulate commercial speech in three regards: prohibiting certain false or misleading communications, or methods of communication thought to be inherently conducive to overreaching or fraud; requiring advertisements or solicitations to contain certain disclaimers; and requiring advertisement or solicitations to be filed with the Review Committee of the state bar. Because there must be a reasonable proportion between the government's interest in regulating commercial speech and the means chosen to further that interest, each of the challenged provisions of the amended rules must be individually scrutinized, to ensure they are not more broad than reasonably neces-

sary to protect consumers from false and deceptive communications from lawyers.

Before adverting to this analysis, however, it is helpful to note that the Supreme Court has indicated more tolerance for regulations that impose less restrictive regulations on speech, such as disclosure requirements, than those imposing total prohibitions on speech. *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651, 105 S.Ct. 2265, 2282, 85 L.Ed.2d 652 (1985) ("[I]n virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, 'warning[s] or disclaimer[s] might be appropriately required ... in order to dissipate the possibility of consumer confusion or deception'") (quoting *In re R.M.J.,* 455 U.S. 191, 201, 102 S.Ct. 929, 936, 71 L.Ed.2d 64 (1982); *see also Bates v. State Bar of Arizona,* 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977) (holding states may not ban truthful advertisements concerning the availability and terms of routine legal services, but also noting "that some limited supplementation, by way of warning or disclaimer or the like, might be required ... so as to assure the consumer is not misled."); *In re R.M.J.,* 455 U.S. at 203, 102 S.Ct. at 937 ("the States may not place an absolute prohibition on certain types of potentially misleading information, *e.g.,* a listing in of areas of practice, if the information may also be presented in a way that is not deceptive.").

Consistent with this view, the Supreme Court has observed that "a holding that a total ban is unconstitutional does not necessarily preclude less restrictive regulation of commercial speech." *Peel v. Attorney Registration and Disciplinary Commission of Illinois,* 496 U.S. 91, 111 n. 17, 110 S.Ct. 2281, 2292 n. 17, 110 L.Ed.2d 83 (1990) (plurality opinion). For instance, in *Zauderer,* the Court rejected an advertising attorney's argument that a state-imposed requirement that he include a disclaimer in his advertising unconstitutionally abridged his First Amendment rights:

Appellant, however, overlooks material differences between disclosure requirements

and outright prohibitions on speech. In requiring attorneys who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses, Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them provide somewhat more information than they might otherwise be inclined to present.... Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal. *Id.* at 650–51, 105 S.Ct. at 2281–82 (emphasis in original).

 Nonetheless, a state's imposition of disclosure or disclaimer requirements on commercial speech is not immune from constitutional constraints. The Court has held that disclosure requirements that are "unjustified" or are "unduly burdensome" may violate the First Amendment's protection of commercial speech. *Zauderer*, 471 U.S. at 651, 105 S.Ct. at 2281–82. For example, in *Ibanez v. Florida Department of Business Professional Regulation, Board of Accountancy,* —— U.S. ——, ——, 114 S.Ct. 2084, 2090, 129 L.Ed.2d 118 (1994), the Court held unconstitutional a regulation which prohibited a lawyer who was also a certified financial planner ("CFP") from designating herself as a "specialist" in an advertisement, unless her advertisement also included a disclaimer listing, *inter alia,* the "recognizing agency's" educational, experience, and testing requirements for certification, as well as a statement that "the recognizing agency is not affiliated with or sanctioned by the state or federal government." The Court's holding was based on the state's failure to point to any evidence showing the CFP designation was even potentially misleading, and also the fact that the detail required in the disclaimer "effectively rules out notation of the 'specialist' designation on a business card or letterhead, or in a yellow pages listing." *Id.* at ——–——, 114 S.Ct. at 2090–91 (footnote omitted). Thus, while disclosure requirements are generally understood to be a less-

intrusive regulation of commercial speech, unduly burdensome or unjustified disclosure requirements will not withstand constitutional scrutiny.

Defendants carry the burden of vindicating the amended rules under these standards, for "[i]t is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1800 (quotation omitted). Moreover, this burden is not inconsequential; defendants must demonstrate that the perceived harms concerning legal advertising and solicitation are real, and will be alleviated in a significant way by the amended rules. *See id.,* —— U.S. at ——, 113 S.Ct. at 1803.

### 1. Is the governmental interest advanced in support of the amended rules substantial?

 Defendants contend the amended rules advance a substantial governmental interest, because they are crafted to protect the public from false, deceptive, or misleading lawyer communications, or, stated another way, to ensure communications from lawyers flow both freely and cleanly. Plaintiffs concede that the Supreme Court has recognized defendants' professed governmental interest as substantial. *See Edenfield,* —— U.S. at ——, 113 S.Ct. at 1799 (" 'the First Amendment ... does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely' ") (quoting *Virginia State Bd. Of Pharmacy,* 425 U.S. at 771–72, 96 S.Ct. at 1830–31). Nonetheless, plaintiffs argue that defendants' stated purpose is merely pretextual, the defendants' real concern being the protection of the legal profession's image, as well as the protection of those lawyers who are so well ensconced in the legal profession as not to need to advertise to attract clients. *See* Pla.s' Posttrial Brief 15. Hence, plaintiffs maintain that the alleged pretextual governmental interest cannot justify any of the amended rules. *Cf. Edenfield,* —— U.S. at ——, 113 S.Ct. at 1798 ("Neither will we turn away if it appears that the stated interests are not the actual interests served by the restriction.").

Contrary to this argument, however, the evidence establishes that real, and not merely illusory, concerns about false and misleading lawyer communications were the bases of the amended rules. The transcripts from the eight hearings conducted by the Special Committee during the drafting process, which were admitted into evidence during trial, establish that the Special Committee was made aware of significant problems with false or deceptive attorney advertising and solicitations.[22] For example, Morrison recalled seeing a document at one of the hearings that resembled a formal legal document, such as a subpoena, and contained language to the effect that the person to whom the document was sent should appear at the law offices of a particular lawyer to discuss a recent automobile accident. This type of solicitation letter is misleading, in that it could lead its recipient to believe some legal process had been instigated by which the soliciting lawyer had been assigned the recipient's particular case.

Other evidence presented to the Special Committee suggested the need for more restrictive legal advertising and solicitation rules. For example, testimony concerning misleading solicitation letters and yellow page advertising was presented at the Houston hearing. *See* Def.s' Ex. 96. A witness at the Houston hearing stated that she received telephone solicitations from lawyers the same day that she had an automobile accident. *Id.* At the Dallas hearing, a witness testified about lawyer advertisements which contained abbreviated disclaimers, and disclaimers written in such small typeface that consumers could not decipher them. *See* Def.s' Ex. 97. At the El Paso hearing, a witness testified that he was aware of attorneys advertising that they could speak Spanish, when, in fact, they could not. *See* Def.s' Ex. 98.

Paul Weinstein, Esquire ("Weinstein"), one of the plaintiffs in this action, admitted from the witness stand that a solicitation letter he has used in the past, and continues to use, contains misleading language. Weinstein, a criminal defense attorney who practices in Harris County, Texas, testified that he primarily attains clients through the use of targeted solicitation letters. These letters are sent to individuals who have been charged with various crimes in the Harris County region. One such letter contains the following language: "As a *Former* Houston Assistant City Attorney with over 25 years experience, I have handled over 3,000 Misdemeanor cases similar to yours." Pla.s' Ex. 138 (emphasis in original). When questioned about his service at the Houston City Attorney's office, Weinstein admitted that he only served a single year in the office, and that during his year-long tenure, he never prosecuted or even investigated a criminal case.[23] The language contained in this letter is misleading, for it obviously leaves the impression that Weinstein has had significant criminal prosecution experience. Weinstein admitted as much during cross-examination, stating that the language could be interpreted as being "incorrect."

Accordingly, defendants' articulated interest in preventing the dissemination of false or deceptive lawyer communications is not pretextual, and as previously stated, constitutes a substantial governmental interest. Notwithstanding, the fact that defendants' stated interest is substantial in the abstract does not establish that individual provisions of the amended rules serve that interest in the manner required by the First Amendment. *See Edenfield,* —— U.S. at ——, 113 S.Ct. at 1800. To withstand constitutional scrutiny, defendants must also establish that each of the amended rules challenged by plaintiffs directly advances the stated governmental interest, and is no broader than reasonably necessary to serve that interest. *Id.*

---

**22.** The transcripts of the hearings have not been considered for the purpose of establishing the truth of these various incidents, but, rather, they have been reviewed for the more limited purpose of establishing the grounds for the Special Committee's perception and opinion that problems with false and misleading lawyer advertising actually existed in the state. *See* Fed.R.Evid. 801(c) (defining hearsay as out of court state-

ments "offered in evidence to prove the truth of the matter asserted").

**23.** Weinstein testified that his purpose for including this statement in his letter was to inform the reader that he was a native Houstonian, or at least had "Houston roots."

As previously discussed, plaintiffs assert a general challenge that the amended rules should be declared unconstitutional *in toto,* and also particularized challenges to specific provisions of the amended rules. The rule-by-rule challenges shall be addressed first.

## 2. Trade Names

■ Plaintiff TAC contends that amended rule 7.01 is unconstitutional because it prohibits the use of "truthful, non-misleading, non-deceptive, descriptive trade names," such as "Bankruptcy Clinic." However, the Supreme Court has explained that the use of trade names in commercial advertising poses significant risks of deception:

> The possibilities for deception are numerous. The trade name of an optometrical practice can remain unchanged despite changes in the staff of optometrists upon whose skill and care the public depends when it patronizes the practice. Thus, the public may be attracted by a trade name that reflects the reputation of an optometrist no longer associated with the practice. A trade name frees an optometrist from dependence on his personal reputation to attract clients, and even allows him to assume a new trade name if negligence or misconduct casts a shadow over the old one.

*Friedman v. Rogers,* 440 U.S. 1, 13, 99 S.Ct. 887, 896, 59 L.Ed.2d 100 (1979). The same risks exist with respect to attorney advertising. Hence, this rule does no more than require commercial information about legal services "appear in such a form as is necessary to prevent it being deceptive." *Id.* at 16, 99 S.Ct. at 897 (citation and quotation omitted). The prohibition contained in amended rule 7.01 on the use of trade names is therefore justified, and does not infringe the First Amendment's protection of commercial speech.

## 3. False or Misleading Communications

■ Plaintiffs argue that amended rule 7.02(a), which prohibits a Texas lawyer from making "any false or misleading communication about the qualifications or services of any lawyer or firm," violates the First Amendment, because the rule creates strict liability for false or misleading communications. As has been explained above, amended rule 7.02 applies only to communications made for the purpose of obtaining professional employment, and thus applies only to commercial speech. The Supreme Court has consistently held that "false, deceptive, or misleading commercial speech may be banned." *Ibanez,* —— U.S. at ——, 114 S.Ct. at 2088; *Zauderer,* 471 U.S. at 638, 105 S.Ct. at 2275; *In re R.M.J.,* 455 U.S. at 203, 102 S.Ct. at 937; *Central Hudson Gas & Electric Corp.,* 447 U.S. at 563–64, 100 S.Ct. at 2350–50. Amended rule 7.02(a) bans only misleading or false commercial speech, and thus is not constitutionally infirm.

## 4. Comparison of lawyer services

■ Amended rule 7.02(a)(3) provides that a communication is false or misleading if it "[c]ompares the lawyer's service with other lawyer's services, unless the comparison can be substantiated by reference to verifiable, objective data." Plaintiff TAC contends that this rule bans truthful, nonmisleading commercial speech, since this rule will prohibit lawyers from communicating hyperbole or opinion.

The Supreme Court has recognized that the public may lack sophistication with respect to legal services:

> [M]isstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising. For example, advertising claims as to *quality* of services—a matter that we do not address today—are not susceptible of measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction.

*Bates,* 433 U.S. at 383–84, 97 S.Ct. at 2709 (emphasis added). Importantly, this rule does not prevent all claims of quality in a lawyer's advertisement or solicitation. The rule only prohibits lawyers from making claims they cannot substantiate. Plaintiffs Adler, Newton, and Bandy testified that they would have no difficulty substantiating the claims made in their advertisements or solicitations. Similarly, plaintiffs' witness, Wal-

lace Craig, Esquire ("Craig"), a lawyer practicing in Hurst, Texas, testified that he could substantiate the comparison, "some firms routinely settle claims for less than they are worth," used in one of his television commercials, by gathering information from insurance companies. Hence, it appears that, in practical effect, this rule will only minimally restrict the information a lawyer may include in his or her advertising. Amended rule 7.02(a)(3), therefore, "reasonably fits" the state's interest in protecting consumers from false or deceptive advertising from lawyers, and does not violate the First Amendment.

### 5. Telephone Solicitation

■ At trial, plaintiff Weinstein testified that he desired to telemarket his services to persons who have had a warrant issued for their arrest, but have not yet been arrested. He stated that, by telephoning these individuals, he could provide them truthful, and possibly very useful information. Weinstein testified that he would inform such persons that if a bail bond were posted, or the warrant recalled, they could avoid being arrested pursuant to the warrant, and that he, Weinstein, might be able to arrange a bail bond transaction for that person, or get the warrant recalled.

Amended rule 7.03 prohibits Weinstein from seeking professional employment by calling potential clients on the telephone, or engaging in face-to-face solicitation, in certain circumstances.[24] Plaintiffs have not objected to the rule's prohibition of in-person solicitation, and it is wise that they do not, for such restriction was specifically upheld in *Ohralik v. Ohio State Bar,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Instead, plaintiffs argue that defendants have failed to meet their burden to justify a prophylactic rule banning telephone solicitation by lawyers.

Defendants advance two justifications for this rule. First, defendants contend that, based on *Ohralik,* the preventative rule is

justified. Second, defendants argue that, because the risk of overreaching or fraud is high in telephone solicitation, and inasmuch as telephone solicitations are exceedingly difficult to monitor, the ban on telephone solicitation is justified as a narrowly tailored prophylactic rule. These arguments will be considered, in turn.

In *Ohralik,* the Supreme Court upheld, against a First Amendment challenge, the discipline of an attorney who approached two young women, one in a hospital and one shortly after returning home from the hospital, and "urged" his services upon them. *Id.* at 467, 98 S.Ct. at 1924. The Court held that a state bar may constitutionally prohibit a lawyer from engaging in solicitation in these circumstances, even if the lawyer is entirely truthful during the contact, since such meetings are "inherently conducive to overreaching and other forms of misconduct." *Id.* at 464, 98 S.Ct. at 1923. Face-to-face solicitation by lawyers poses these risks, the Court concluded, because a lawyer is "a professional trained in the art of persuasion," and since recently-injured lay people may be especially susceptible to a lawyer's persuasive tactics, and thus are likely to respond with "uninformed acquiescence" to a lawyer's proffer of services. *Id.* at 465, 98 S.Ct. at 1923.

Additionally, the Court noted that problems of enforcement justified the prophylactic ban on in-person solicitation:

> Unlike the advertising in *Bates,* in-person solicitation is not visible or otherwise open to public scrutiny. Often there is no witness other than the lawyer and the lay person whom he has solicited, rendering it difficult or impossible to obtain reliable proof of what actually took place. This would be especially true if the lay person were so distressed at the time of the solicitation that he could not recall specific details at a later date. If appellant's view were sustained, in-person solicitation

---

24. Amended rule 7.03(a) provides: "A lawyer shall not by in-person or telephone contact seek professional employment concerning a matter arising out of a particular occurrence or event, or series of occurrences or events, from a prospective client or nonclient who has not sought

the lawyer's advice regarding employment or with whom the lawyer has no family or past or present attorney-client relationship when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain...."

would be virtually immune to effective oversight and regulation by the State.... *Id.* at 466, 98 S.Ct. at 1924.

Subsequent decisions, however, have made clear that the holding in *Ohralik* is narrow, and that "the constitutionality of a ban on personal solicitation will depend upon the identity of the parties and the precise circumstances of the solicitations." *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1802; *see also Zauderer,* 471 U.S. at 641, 105 S.Ct. at 2276–77 ("Our decision in *Ohralik* was largely grounded on the substantial difference between face-to-face solicitation and the advertising we had held permissible in *Bates."*). In *Edenfield,* for instance, a certified public accountant ("CPA") desired to solicit prospective clients over the telephone, but was prohibited from doing so by a Florida Board of Accountancy rule. *See id.* at ——, 113 S.Ct. at 1796. The Court found the ban on direct, uninvited, personal solicitation by CPAs to be unconstitutional, *id.,* and distinguished *Ohralik* on the grounds that, unlike lawyers, CPA's are not trained persuaders, and that contrary to the individuals being solicited in *Ohralik,* the prospective clients the CPA sought to solicit would not be approached at a moment of "high stress and vulnerability." *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1803. Accordingly, the telephone solicitation proposed by the CPA in *Edenfield,* as opposed to the face-to-face solicitation employed by the lawyer in *Ohralik,* could not be considered "more often than not ... injurious to the person solicited." *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1803 (citing *Ohralik,* 436 U.S. at 466, 98 S.Ct. at 1923–24) Ultimately, the Court determined the restrictions on the CPA's telephone solicitations violated the First Amendment, because they did not advance a substantial governmental interest in a direct and material way. *Id.* at ——, 113 S.Ct. at 1804.

The holding in *Ohralik,* consequently, does not predetermine the question of whether a state may constitutionally prohibit telephone solicitations in the manner prescribed by amended rule 7.03. Instead, defendants must establish that the ban on telephone solicitation by lawyers advances its goal of preventing overreaching and fraud by law-yers, and protecting the privacy of consumers in a direct and material way, and that there is a "reasonable fit" between such a restriction and these interests:

> *Ohralik* in no way relieves the State of the obligation to demonstrate that it is regulating speech in order to address what is in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem.

*Edenfield,* —— U.S. at ——, 113 S.Ct. at 1803.

Defendants contend that the ban on telephone solicitation by lawyers in amended rules 7.03 directly advances the state's interest in preventing overreaching and fraud by lawyers. In this regard, defendants rely on the testimony and report of William R. Edwards, Esquire ("Edwards"), an attorney whose practice primarily entails representing plaintiffs in commercial and personal injury litigation. *See* Def.s' Ex. 330. While Edwards served on a grievance committee of the state bar for six years, and thus reviewed many alleged violations of the Texas rules, he stated at trial that he had no personal knowledge of lawyers telemarketing their services in the state. Instead, Edwards' testimony concerning obtrusive telephone solicitation seemed to be founded on his being "bombarded" with telemarketing related to "investment opportunities." Edwards did testify that various of his former clients had unpleasant experiences with soliciting lawyers, but those situations involved mailed solicitations, not telephone solicitations. Hence, defendants have offered only conclusory evidence that Texas lawyers are using the telephone in overly-intrusive ways to market their services. *See Edenfield,* —— U.S. at —— ——, 113 S.Ct. at 1800–01 ("The only suggestion that a ban on solicitation might help prevent fraud and overreaching ... is [an] affidavit ... which contains nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications.").

Nonetheless, it is recognized that, simply because lawyers have not telemarketed their services in the past, this circumstance does not mean defendants' concern about such

activity is purely conjectural. Texas lawyers have been prohibited from telephonic solicitation for some time, and hence a lack of evidence as to fraudulent telephonic solicitations by Texas lawyers is not surprising. Moreover, while there is scant evidence that Texas lawyers have engaged in fraudulent telemarketing, there is substantial evidence that Texas lawyers have engaged in misleading or fraudulent direct mail solicitation. Weinstein's letter, discussed above, is a prime example. Lawyers inclined to put misleading statements in a letter seemingly would be just as likely to communicate misleading messages over the telephone. It is found, therefore, that defendants are justified in their assertion that the ban on telephonic solicitation by lawyers in amended rule 7.03(a) directly advances the interest in protecting the public from overreaching by lawyers.

Defendants also argue that a more narrowly-tailored provision—one that imposed something less than a blanket ban on telephone solicitations—would not adequately safeguard consumers. In this regard, defendants suggest that telephonic communications present the same potential for overreaching and fraud by lawyers, and the same difficulties with enforcement, as does face-to-face solicitation.

In determining whether telephonic communications are a mode of expression "rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud," *see Shapero,* 486 U.S. at 475, 108 S.Ct. at 1922 (quoting *Ohralik,* 436 U.S. at 457–58, 98 S.Ct. at 1919–20), it is necessary to examine whether lawyers will be able to employ their arts of persuasion over the telephone to the same degree as in personal meetings with prospective clients. It appears likely that lawyers will be more limited in their ability to employ persuasive techniques over the telephone than in a face-to-face confrontation. In some face-to-face situations, such as the hospital room solicitation described in *Ohralik,* it may be particularly difficult for a consumer to end a conversation

with a lawyer. With telephone solicitations, however, the consumer need only hang up the telephone receiver to end the matter. It is thus evident that the recipients of telephone solicitations have a much more effective means of ending unpleasant or harassing calls than those subjected to an in-person solicitation. *Cf. Shapero v. Kentucky Bar Assn.,* 486 U.S. 466, 476, 108 S.Ct. 1916, 1923, 100 L.Ed.2d 475 (1988) (targeted solicitation letter did not create sufficient concerns of lawyer overreaching to justify an outright ban on such letters, in part because the letter could be "put in a drawer to be considered later, ignored, or discarded.").

In addition, if lawyers were allowed to make telephone solicitations, the consumers receiving such calls, in all likelihood, would know how to deal with them. A lawyer, though a "professional trained in the art of persuasion," is not likely to be more persuasive on the telephone than professional telemarketers pawning "investment opportunities," and, as Edwards' testimony makes clear, those in today's world are accustomed to dealing with telemarketers selling all kinds of goods or services.

Nevertheless, some potential for overreaching and fraud in telephone solicitations must be recognized. Calls made to prospective clients shortly after a traumatic event, such as an arrest or accident, are likely to find such clients in a fragile emotional state. It also must be acknowledged that lawyers have a greater potential to exploit the consumer's emotional infirmities during telephone conversations, than they would in letters or other advertisements. Lawyers might, for example, attempt to convince prospective clients to retain their services during the conversation.[25] Such direct pressure could not be applied in written communications or advertisements. Thus, telephonic communications provide possibilities for lawyer overreaching, and fraud, but not to the same degree as face-to-face solicitations.

The unique difficulties inherent in monitoring telephone solicitations from lawyers, however, provides the strongest justification for

---

25. The Texas rules require contingent fee arrangements to be in writing. *See* Tex.Disciplinary R.Prof.Conduct 1.04(d). Presumably, however, a client could enter into an oral employment contract with a lawyer over the telephone, so long as it did not involve a contingent fee.

imposing a ban on such communications. Unlike a written advertisement or solicitation letter, or even a televised commercial, there is generally no physical record of a telephone conversation that can be reviewed, to determine if a lawyer's statements made during the course of a telephone solicitation were overreaching or fraudulent. *Cf. Ohralik,* 436 U.S. at 466–67, 98 S.Ct. at 1923–24 (describing difficulty in monitoring face-to-face solicitations). And like face-to-face solicitations, telephone solicitations will not be "visible or open to public scrutiny." *Ohralik,* 436 U.S. at 466, 98 S.Ct. at 1924. Misleading or coercive telephone solicitations apparently would be at least as difficult to prove as fraudulent face-to-face solicitations. In fact, they may be more difficult, since the consumer will only be able to identify the caller by his or her voice.

Moreover, no evidence was presented to show how telephone solicitations might be regulated in any less-restrictive manner. It appears that any attempt to compel lawyers to record or otherwise preserve telephone conversations with prospective clients would raise serious privacy concerns, as well as concerns regarding the attorney-client privilege. Thus, because of difficulties inherent in regulating telephone communications, and the potential for overreaching and fraud by lawyers during such communications, it is found that the drafters of the amended rules were justified in imposing a blanket ban on telephone solicitations. The prohibition of telephone solicitations by lawyers provided for in amended rule 7.03(a) is found to be a constitutional restriction on commercial speech.

### 6. Disclaimers Relating to Board Certification

The state bar has created a system of certifying attorneys as specialists in certain areas of practice. The Texas Board of Legal Specialization oversees the certification process, and is responsible for administering the application and examination procedures a Texas lawyer must endure to become a "board certified specialist." The amended rules restrict a Texas lawyer's ability to advertise their specialties in several respects.

Amended rules 7.04(a) & (b) prohibit a Texas lawyer from advertising that he or she has been designated a specialist, unless the certifying organization is the Texas Board of Legal Specialization, or has been accredited by the Texas Board of Legal Specialization. Amended rule 7.04(b)(2)(ii) sets out criteria for the accreditation of certifying organizations. Attorneys certified by the Texas Board of Legal Specialization may include the phrase: "Board Certified [area of specialization]—Texas Board of Legal Specialization," in their advertisements. *See* amended rule 7.04(a, b)(2) & (b)(2)(i). If the attorney has been certified as a specialist by an organization other than the Texas Board of Legal Specialization, and such organization has been accredited by the Texas Board of Legal Specialization, the attorney may include the phrase: "Certified [area of specialization] [name of certifying organization]," or a statement to that effect. *See* amended rule 7.04(b)(2)(ii).

The amended rules also require a Texas lawyer to include a disclaimer, if the lawyer lists any area of practice in his or her advertisement and the lawyer has not been certified as a specialist in that particular area by the Texas Board of Legal Specialization. *See* amended rule 7.04(b)(3). The disclaimer must read: "Not Board Certified by the Texas Board of Legal Specialization," and it must be stated with respect to each area of practice advertised in which the lawyer has not been awarded a certificate of specialization. *See id.* If the Texas Board of Legal Specialization has not designated a particular area of law for certification, *e.g.,* civil rights law, and an attorney includes that area of practice in an advertisement, the attorney must still include the disclaimer, but has the additional option of including the phrase: "No designation has been made by the Texas Board of Legal Specialization for a Certificate of Special Competence in this area." *Id.*

The statements and disclaimers relating to specialties and board certification must be displayed conspicuously in the advertisement, and the language used must mirror that in the amended rules, without abbreviations, alterations, or additions. *See* amended rule 7.04(c). Plaintiffs complain that these dis-

claimers and limitations constitute unduly burdensome restrictions on their commercial speech, and render lawyer advertisements confusing and potentially deceptive to consumers.

The Supreme Court has held that a lawyer's ability to advertise his or her certification as a specialist may not be categorically banned. *Peel,* 496 U.S. at 110–12, 110 S.Ct. at 2293. The Court, however, noted that "[t]o the extent that potentially misleading statements of private certification or specialization could confuse consumers, a State might consider screening certifying organizations or requiring a disclaimer about the certifying organization or the standards of the specialty." *Id.* at 110, 110 S.Ct. at 2292 (citing *In re R.M.J.,* 455 U.S. at 201–03, 102 S.Ct. at 936–38). Clearly, the drafters of the amended rules adopted this suggestion.

■■■ Advertising by a lawyer that he or she is a certified legal specialist may be misleading, especially if the certifying organization has not made a thorough inquiry into the lawyer's ability before issuing its certification. *See id.* at 100–02, 110 S.Ct. at 2288. The amended rules, however, do not categorically ban advertising oneself as a specialist. Instead, the amended rules disallow a lawyer from advertising as a certified specialist, only if the certifying organization has not been accredited by the Texas Board of Legal Specialization. This restriction directly advances the state's interest of ensuring that only reliable, as opposed to misleading, information concerning a lawyer's certification as a specialist reaches the marketplace. In addition, the accreditation process described in the amended rules is a reasonable means of ensuring that certificates of specialization are actually earned, and are not spurious. *See* amended rule 7.04(b)(2)(ii). Hence, the limited restrictions imposed on a lawyer's ability to advertise as a certified specialist are in reasonable proportion to the state's legitimate need to prevent misleading advertisements.

■■■ Plaintiffs also maintain that defendants have failed to present any credible evidence showing that the disclaimer as to practice areas advances the state's interest in protecting consumers from deceptive attorney advertising; and that even if the disclosure requirement in question were found to advance a governmental interest, it is an unduly burdensome requirement, taking into account that the disclaimer must be published "with respect to each area advertised."

At the outset, it should be noted that the amended rules do not prohibit lawyers from listing any area of practice in their advertisements, nor does it appear that such a broad rule would withstand constitutional scrutiny. *See In re R.M.J.,* 455 U.S. at 191, 102 S.Ct. at 931. The amended rules do, however, require a lawyer to disclose truthful information relating to areas of practice advertised. Listing areas of practice in an advertisement is likely to give consumers the impression that the lawyer specializes or focuses his particular practice in that area. The disclaimer that the lawyer is "Not Board Certified by the Texas Board of Legal Specialization" simply informs the reader that while the attorney may "specialize" in a particular area, he is not board certified in that area. This disclaimer is an appropriate mechanism to cure the false impression that may be created when a lawyer lists areas of practice in his or her advertisement.

Moreover, the requirement that the disclaimer be stated "with respect to each area advertised" does not mean lawyers will have to repeat the phrase "Not Board Certified by the Texas Board of Legal Specialization" every time they list an area of practice. It seems apparent that a single disclaimer followed by the areas listed in the advertisement, or a statement such as "Not Board Certified by the Texas Board of Legal Specialization in any of the areas listed" would suffice. A virtually identical disclaimer rule has been in force since the Texas rules were adopted, *see* Tex.Disciplinary R.Prof.Conduct 7.01(c)(3), and no evidence was presented that lawyers have been required to repeat the phrase: "Not Board Certified by the Texas Board of Legal Specialization," each time they list an area of practice.

■■■ Plaintiffs also complain that the requirement imposed by amended rule 7.04(c), that the disclaimers discussed above be included without abbreviations, additions, or

changes, is broader than reasonably necessary to protect the public from misleading disclaimers. Evidence was presented at trial that Texas lawyers have published various advertisements containing misleading or incomprehensible disclaimers, such as "Not Bd Cert Tx BLS." The requirement that only certain language be used in the disclaimers advances the state's interest in protecting against this form of deception, and is a "reasonable fit" to the problem of deceptive advertising. Hence, amended rule 7.04(c) comports with the First Amendment's protection of commercial speech.[26]

### 7. Actors in Advertisements

■ The amended rules prohibit a Texas lawyer from utilizing an actor to portray the lawyer in television commercials, or other visual media, and also prohibit an actor from narrating an advertisement as if the actor were the advertising attorney in any advertisement utilizing audio recording. *See* amended rule 7.04(g). Plaintiffs allege that this rule bans truthful speech, and that a much more narrow rule would be sufficient. Defendants contend that this rule is aimed solely at promoting truth in advertising, maintaining that "it is not truthful to show a Cadillac and say it is a Pinto." *See* def.s' Opening Trial Brief, Jan. 30, 1995, at 14.

In support of their argument, plaintiffs point to two television commercials advertising the services of Wallace Craig and Associates, a law firm in Hurst, Texas. In one commercial, Craig himself appears, and discusses his law firm's practice. *See* Pla.s' Ex. 34. In the second commercial, an actor seated at a desk tells the audience that insurance companies research the reputation of an accident victim's lawyer when considering settlement of a claim, and that some law firms regularly settle claims for less than the claims are worth. At the end of this commercial, the actor states, "We're a firm with

the ability and determination to see your case through," and then a screen appears listing the name and telephone number of Wallace Craig's firm. *See id.* The second commercial strongly suggests that the actor is an attorney associated with Wallace Craig's firm, but since the actor is not a lawyer who practices with this firm, the commercial is, in this respect, misleading. Of course, a state may prohibit misleading advertising entirely. *See Ibanez*, —— U.S. at ——, 114 S.Ct. at 2088 (citing cases).

In addition, the restriction in amended rule 7.04(g) is limited in scope; it only prohibits the casting of actors in roles "portraying" the attorney being advertised, or narrating commercials as if he or she were the attorney being advertised. The rule does not preclude the use of actors in other scenarios. Even if this rule sweeps within its bounds radio or television advertisements that are only potentially misleading, the restriction, nevertheless, directly advances the legitimate state interest of protecting consumers from potentially deceptive advertising, and the restriction is in reasonable proportion to the state's interest in protecting consumers from such advertisements.[27] It is therefore determined that amended rule 7.04(g) is constitutional under the Supreme Court's guidelines pertaining to commercial speech.

### 8. Disclaimers relating to Contingency Fees

■ If a lawyer's advertisement reveals a willingness or potential willingness of the lawyer or the lawyer's firm to render legal services on a contingency fee basis, the amended rules require a lawyer to disclose certain details about the contingent fee arrangement. *See* amended rule 7.04(h). Such an advertisement or solicitation must disclose whether the potential client will be liable for court costs or other expenses; and if specific contingent fee percentages or ranges of con-

---

26. Plaintiff TAC's challenge to amended rule 7.04(*o*) is based on that rule's incorporation of the requirements set out in amended rule 7.04(b). Since it has been determined that amended rule 7.04(b) is a constitutional regulation of commercial speech, the challenge to amended rule 7.04(*o*) need not be addressed further.

27. In evaluating this rule, it bears emphasis that the rule has an impact only upon advertisements distributed in the electronic media. The Supreme Court has indicated that advertising regulations implicating the electronic media may "warrant special consideration." *See Bates*, 433 U.S. at 384, 97 S.Ct. at 2709.

tingent fee percentage are discussed, the advertisement or solicitation letter must disclose whether the percentage is calculated before or after expenses are deducted from the recovery. *Id.*

Plaintiffs' claim that these disclosures are unduly burdensome or unjustified are easily dealt with, for the Supreme Court squarely upheld similar requirements in *Zauderer*:

> The State's application to appellant of the requirement that an attorney advertising his availability on a contingent-fee basis disclose that clients will have to pay costs even if their lawsuits are unsuccessful (assuming that to be the case) easily passes muster under this standard. Appellant's advertisement informed the public that "if there is no recovery, no legal fees are owed by our clients." The advertisement makes no mention of the distinction between "legal fees" and "costs," and to a layman not aware of the meaning of these terms of art, the advertisement would suggest that employing appellant would be a no-lose proposition in that his representation in a losing case would come entirely free of charge. The assumption that substantial numbers of potential clients would be so misled is hardly a speculative one: it is a commonplace that members of the public are often unaware of the technical meanings of such terms as "fees" and "costs"—terms that, in ordinary usage, might well be virtually interchangeable. When the possibility of deception is as self-evident as it is in this case, we need not require the State to "conduct a survey of the . . . public before it [may] determine that the [advertisement] had a tendency to mislead." The State's position that it is deceptive to employ advertising that refers to contingent-fee arrangements without mentioning the client's liability for costs is reasonable enough to support a requirement that information regarding the client's liability for costs be disclosed.

*Zauderer*, 471 U.S. at 652–53, 105 S.Ct. at 2282–83 (internal citation omitted). The disclosure requirements required in amended rule 7.04(h) have been shown to be needed to protect against misleading advertising related to contingent-fee contracts, and hence they are constitutionally justified.

■ Moreover, the requirement imposed by amended rule 7.04(i) is not unduly burdensome. The rule requires an attorney who advertises a specific fee or range of fees for a particular service, actually to charge that fee during the time the advertisement is reasonably expected to be effective in attracting clients, unless the advertisement specifies a shorter period. *See* amended rule 7.04(i). This requirement is not a ban on speech; rather, the rule seeks to ensure that the advertised price for an attorney's services is, in fact, the price a client be required to pay. While this rule will require an advertising lawyer to consider carefully the prices at which his or her services are advertised, such a requirement cannot be said to be unduly burdensome. Accordingly, it is found that the drafters of the amended rules were justified in attempting to assure that the advertised prices for legal services represent the actual prices charged.

### 9. Branch Offices

■ Amended rule 7.04(j) regulates the manner in which Texas lawyers or law firms may advertise the location of their offices. The rule requires an advertisement to disclose the location of the lawyer's or law firm's "principal" office,[28] and prohibits a lawyer or law firm from advertising the location of another office, unless such office is staffed by a lawyer at least three days a week, or the advertisement discloses "the days and time during which a lawyer will be present at that other office." *See* amended rule 7.04(j).

Plaintiffs contend that this rule effectively imposes a blanket ban on advertising branch offices that are not staffed by a lawyer at least three days a week, or, alternatively, imposes an unduly burdensome disclosure requirement. Plaintiffs further argue that, given the sometimes indeterminate or exigent schedules of single practitioners or

---

**28.** Apparently, the lawyer or law firm need not identify its principal office as such in the advertisement, so long as the advertisement discloses the principal office's location. *See* amended rule 7.04 cmt. 16.

small firms operating branch offices, as, *e.g.*, when an attorney is called to court or other engagements on short notice, it may be impossible for the attorney or small firm to fix the exact days and times when a lawyer will be in attendance at a branch office. Such attorneys or firms, plaintiffs assert, are effectively banned from advertising a branch office that is not staffed by an attorney at least three days a week. Alternatively, plaintiffs contend that the rule's requirement that an attorney or firm be able to surmise the days and times a lawyer will be present in the branch office in advance of the advertisement's distribution date, amounts to an unduly burdensome disclosure requirement.

Defendants argue that the "branch office rule" is needed to address specific problems with false advertising. Morrison testified that the rule arose out of several occurrences in South Texas. He alluded to several major disasters, and stated that he was aware that certain law firms, some from Texas and some from other states, opened offices in the region after the accident, and thereafter commenced a heavy advertising campaign. According to Morrison, the law firms contracted with numerous clients in a very brief time span, but subsequently vacated their recently-established offices. Hence, he testified, their clients had an extremely difficult time being serviced by these out of the area firms. Defendants maintain that the branch office rule is designed to avoid this situation by forcing lawyers who advertise to inform prospective clients when they will be available, to the end that prospective clients can make informed decisions as to which lawyer to employ.

Plaintiff Newton described the dilemma the "branch office rule" poses for other lawyers. Newton testified that he has plans to extend his bankruptcy practice to the Plano, Texas, region; and that he hopes to open offices in Plano, Sherman, and Denton, Texas, and intends that only one lawyer staff all of these offices. Newton testified that, under amended rule 7.04(j), he would be precluded from advertising those offices, because the lawyer could not be in all three offices at least three days a week, and, given the nature of his practice, he would not be able to ascertain the days and times the lawyer would be in each location, so as to advertise that information with accuracy.

The scenario described by Morrison certainly constitutes egregious conduct by lawyers, and the state bar is entirely justified in attempting to cure such abuses. The problem with "the branch office rule," however, is that it casts too broad a net. While amended rule 7.04(j) prevents the type of unseemly and deceptive advertising Morrison described, it also prevents lawyers like Newton from advertising truthful information concerning their branch offices. Effectively, the rule presents lawyers like Newton with a Hobson's choice: risk distributing misleading advertisements by not being able to attend the branch office as advertised, or relinquish his or her First Amendment right to commercial expression.

If amended rule 7.04(j) is considered to be a ban on branch office advertising, as plaintiffs argue, it does not constitute a reasonable fit to cure the problem articulated by Morrison. First, there is no guarantee that the rule will prevent the abuses described. Presumably, a law firm could engage in the precise conduct described by Morrison, if it keeps an attorney in the branch office at least three days a week during the time it is "signing up" clients. A more narrowly tailored rule would be a rule structured similar to amended rule 7.04(*l*), which requires a lawyer to disclose that a client's case is likely to be referred to another lawyer, if the lawyer knows or reasonably should know that the case is likely to be referred. The state bar, then, might require a lawyer or firm to disclose that their branch office would be staffed by a lawyer for only limited periods, if the lawyer or firm knows or reasonably should know that eventuality is likely. Another more tailored rule might simply punish attorneys for neglecting clients. As plaintiffs point out, several provisions of the Texas rules already prohibit such neglect. *See* Tex.Disciplinary R.Prof.Conduct 1.01(b)(1) ("In representing a client a lawyer shall not neglect a legal matter entrusted to the lawyer...."); Tex.Disciplinary R.Prof.Conduct 1.03(a) ("A lawyer shall keep a client reasonably informed about the status of a matter

and promptly comply with reasonable requests for information.").

On the other hand, if amended rule 7.04(j) is considered to be a disclosure requirement, as defendants argue, it places too great a burden on attorneys attempting to advertise truthful information concerning their branch offices. A less burdensome disclosure requirement, which would avoid the problems described by Newton, would require a lawyer or law firm advertising a branch office to state the days and times a lawyer will actually be in such office, or, alternatively, to state that meetings with attorneys will be by appointment only. This requirement would enable lawyers to advertise truthful information concerning their branch offices, but without imposing the potentially impossible task of having to divine the days and times a lawyer actually will be in attendance at the branch office. In fact, Newton testified that this is how he currently operates his branch offices. If a client comes into one of Newton's branch offices unannounced, the client can communicate with Newton or another attorney in his firm immediately by means of the telephone. If the client desires to meet with him, or *vice versa*, Newton simply schedules an appointment at the branch office.

Accordingly, whether amended rule 7.04(j) is considered a blanket ban on truthful commercial expression, or merely as a disclosure requirement, it must be declared unconstitutional as it applies to Newton under the guidelines pertinent to commercial speech.

### 10. Disclosures Relating to Referrals

█ Plaintiffs complain that amended rule 7.04(*l*), which requires lawyers to disclose in their advertisements that a case or matter will be referred if the lawyer knows or should know that a referral is likely, is unduly burdensome and unjustified. The essence of plaintiffs' complaint concerning this rule appears to be that prospective clients are not likely to respond to their advertisements or solicitations, if the prospective client knows that the advertising lawyer is unlikely to be the attorney who actually handles the case. Weinstein testified, for example, that consumers would not want to "waste time" talking with him, if they knew he intended to refer their cases.

The evidence presented at trial establishes that some advertising lawyers do, in fact, accept cases that they never intend to handle to completion themselves. Requiring such lawyers to state the truthful fact that a prospective client's legal problem is likely to be referred to another lawyer does not appear to be an unjustified or unduly burdensome requirement on such lawyers. Rather, the disclosure simply provides information that may be highly significant to a consumer who is considering hiring a lawyer. Nor does it appear that the disclaimer required by this rule would occupy much space in a lawyer's advertisement; the lawyer need only say that the case is likely to be referred.

While plaintiffs profess to be concerned by the possibility that a particular case will require referral to a specialist, the comments to the rule dispel their concern:

> [The referral disclosure rule] does not, however, require disclosure of all possible scenarios under which a referral could occur, such as an unforeseen need to associate with a specialist in accordance with Rule 1.01(a) or the possibility of a referral if a prospective client turns out to have a conflict of interest precluding representation by the advertising lawyer.

*See* amended rule 7.04(*l*) cmt. 17. Amended rule 7.04(*l*), then, is a constitutional disclosure requirement.[29]

### 11. Stamping "ADVERTISEMENT" on Written Solicitation Communications

█ Amended rule 7.05 applies to written solicitation communications sent or delivered to prospective clients for the purpose of obtaining professional employment. One provision of the rule provides that such solicitation letters must be marked "ADVERTISEMENT" on the first page of the letter, and, as well, on the face of the envelope. *See* amended rule 7.05(b)(2). If the solicitation is

---

**29.** Plaintiffs also challenge amended rule 7.04(k), but their argument with respect to that rule is limited to its alleged application to noncommercial speech. As discussed in section VI A, it has been determined that the amended rules regulate only commercial speech.

in the form of a self-mailing brochure or pamphlet, the disclaimer must be made in a color that "contrasts sharply with the background color" and the lettering used must be either ⅜ of an inch high or three times the height of the lettering used in the body of the brochure or pamphlet, whichever is the higher. *See id.* This requirement does not extend, however, to certain solicitation communications, specifically: (1) those which are distributed only to the lawyer's family members; (2) to persons who have a present or past attorney-client relationship with the lawyer; (3) those that are not motivated or concerned with a particular past occurrence or event or series of occurrences or events, and are also not motivated or concerned with a specific legal problem of which the lawyer is aware; (4) those that are not motivated by the lawyer's desire for, or possibility of obtaining, pecuniary gain; or (5) those that are requested by prospective clients. *See* amended rule 7.05(e).

Plaintiffs postulate that marking their solicitation letters "ADVERTISEMENT" will vitiate the efficacy of the communications contained therein, because recipients of such letters are likely to consider them "junk mail" and disregard them. Consequently, plaintiffs assert that the "ADVERTISEMENT" stamp is an unduly burdensome requirement.

The Supreme Court has recognized that lawyers may be validly required to stamp "advertisement" on their solicitation letters in some circumstances. In *Shapero v. Kentucky Bar Assn.*, 486 U.S. 466, 476–78, 108 S.Ct. 1916, 1923–24, 100 L.Ed.2d 475 (1988), the Court held that a state bar could not categorically prohibit lawyers from sending targeted, direct-mail solicitation letters to consumers. The Court recognized, however, that a personalized letter from a lawyer presents risks of deception. *Id.* at 476, 108 S.Ct. at 1923. While the mere potential for mistakes did not justify an outright ban on targeted, direct-mail solicitation letters, the Court suggested in *dicta* that, "[i]f the targeted letter specifies facts that relate to particular recipients ... it could require the letter to bear a label identifying it as an

advertisement." *Id.* at 477, 108 S.Ct. at 1924.

In *In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), the Supreme Court found a Missouri rule prohibiting lawyers in that state from mailing "professional announcement cards" to anyone but "lawyers, clients, former clients, personal friends, and relatives" to be unconstitutional, as applied to an attorney who mailed announcement cards to a broader category of persons than allowed by the rule. *Id.* at 206, 102 S.Ct. at 939. In response to the argument that such mailings might frighten the public, the Court noted that "the lawyer could be required to stamp 'This is an Advertisement' on the envelope." *Id.* at 206 n. 20, 102 S.Ct. at 939 n. 20.

The evidence presented at trial demonstrates that it is not an uncommon occurrence for consumers to receive numerous solicitation letters from attorneys after they, or members of their families, have been in accidents, or have been arrested. Many of these citizens find the solicitation letters distressing, especially when the letters arrive shortly after the emotionally traumatic event. The requirement that such letters, and the envelopes enclosing them, be stamped "ADVERTISEMENT" is likely to reduce the anxiety such letters cause consumers, because they will know immediately that they are only advertisements, and do not contain other, more-evocative messages. Moreover, the exemptions contained in amended rule 7.05(e) narrow the situations to which this disclaimer applies, in that the "ADVERTISEMENT" stamp is required only in circumstances likely to provoke anxiety in consumers, and the actual space required for this disclaimer is minimal.

The fact that some consumers may discard a letter prior to reading it is not particularly troubling. While it is entirely true that a lawyer's solicitation letter may contain important information concerning a person's legal rights, including the word "ADVERTISEMENT" on the letter accurately informs the consumer of the envelope's purpose; *i.e.*, to propose a commercial transaction. If the consumer chooses to dispose of the letter without taking the time to read it,

that is, of course, the consumer's right. Hence, the disclosure requirement imposed by amended rule 7.05(b)(2) is not unconstitutionally burdensome.

### 12. Prohibiting statements implying that written solicitation communications have been approved by the State Bar

Amended rule 7.05(b)(4) provides that a written solicitation letter not exempt under amended rule 7.05(e), "shall not contain a statement or implication that the written communication has received any kind of authorization or approval from the State Bar of Texas or from the Lawyer Advertising and Solicitation Review Committee." Plaintiffs contend that this rule prohibits them from including truthful statements in their written solicitation letters. Defendants counter that inclusion of the statement, "This letter approved by the State Bar!" is likely to deceive consumers into believing the author of the letter is a representative of the state bar or "has unusual insight," and that such statements may be banned since "[a] lawyer cannot use deceptive and overreaching techniques to make advertising more effective." *See* Def.s' Posttrial Submission, at 16.

In *In re R.M.J.*, the Supreme Court determined that a lawyer could not be sanctioned for including the phrase: "Admitted to Practice Before: THE UNITED STATES SUPREME COURT," under a rule that prohibited lawyers from identifying the jurisdictions in which they are licensed to practice in their advertisements. *See id.* at 205–06, 102 S.Ct. at 938–39. The Court noted that the statement was not particularly informative, and that it "could" be misleading, but, nonetheless, the Court determined: "There is no finding that appellant's speech was misleading. Nor can we say that it was inherently misleading, or that restriction short of an absolute prohibition would not have sufficed to cure any possible deception." *Id.*

Similarly, the information proscribed by this rule may be entirely truthful, provided that the letter actually has been submitted to the Review Committee and its contents are not disapproved in the prescreening procedure. And no evidence, other than concluso-

ry assertions, has been submitted to show that inclusion of the material banned by this rule would actually mislead consumers. Consumers are not likely to believe that a letter marked "ADVERTISEMENT" and which also contains a statement, *e.g.*, "The form of this letter has been approved by the state bar of Texas," is sent from a representative of the state bar. Moreover, the fact that the statement might lead a reader to think the letter's author .has "unusual insight" is of little importance. A lawyer who has subjected his solicitation letters or other advertisements to the prescreening process to ensure their compliance with the Texas rules can fairly be called insightful. Moreover, to the extent such statements are actually misleading, amended rule 7.05(a)(3) is a more precise way to regulate them. Defendants have failed to show that the prohibition in amended rule 7.05(b)(4) directly advances defendants' stated interest of protecting consumers from false or deceptive communications from lawyers, or that such prohibition is in reasonable proportion to the interest served. Hence, amended rule 7.05(b)(4) must be declared unconstitutional on its face.

### 13. Registered Mail

Amended rule 7.05(b)(5) states that, unless exempt, a lawyer's written solicitation communication: "shall not be sent in a manner, such as by registered mail, that requires personal delivery to a particular individual." Plaintiff TAC contends that this rule is an unjustified restriction on truthful, nondeceptive commercial speech.

Defendants contend that the rule is needed because lawyers have utilized personally delivered mailings to "intimidate" consumers. *See* Def.s' Opening Trial Brief, at 22. However, defendants only point to a single instance in which a consumer received a registered letter from a lawyer and was "intimidated." *See id.*

This rule must be considered to ban a particular mode of communication, personally delivered communications, and as such, the relevant inquiry is "not whether there exist potential clients whose 'condition' makes them susceptible to undue influence, but whether the mode of communication poses a

serious danger that lawyers will exploit any such susceptibility." *See Shapero,* 486 U.S. at 474, 108 S.Ct. at 1922 (citation omitted).

In striking down a state bar rule that banned lawyers from sending targeted, direct-mail solicitation letters, the Supreme Court noted that written communications:

> pose much less risk of overreaching or undue influence than does in-person solicitation. Neither mode of written communication involves the coercive force of the personal presence of a trained advocate or the pressure on the potential client for an immediate yes-or-no answer to the offer of representation. Unlike the potential client with a badgering advocate breathing down his neck, the recipient of a letter ... can effectively avoid further bombardment of his sensibilities simply by averting his eyes.... A letter, like a printed advertisement (but unlike a lawyer), can readily be put in a drawer to be considered later, ignored, or discarded.

*Shapero,* 486 U.S. at 475–76, 108 S.Ct. at 1922–23 (quotations and citations omitted).

Written communications sent by registered mail simply do not pose any greater risk of lawyer overreaching or exploitation than do letters sent by direct mail. The essential difference between correspondence sent by registered mail and that sent by direct mail is, that the recipients of registered letters must engage in a brief exchange with the individuals delivering the correspondence to acknowledge its receipt.[30] Once consumers have possession of such letters, however, they may dispose of them just as readily as they could have if they had picked the letter out of their mail boxes.

In addition, solicitations sent by registered mail are not more difficult to monitor than letters sent by direct mail. Indeed, if defendants are concerned that solicitations sent by registered mail will "intimidate" consumers, the requirement that such letters be marked "ADVERTISEMENT" would seem to alleviate that concern.

It is, therefore, found that the ban imposed by amended rule 7.05(b)(5) against personally delivered mail does not advance the state's asserted interest in protecting consumers from "intimidating" communications from lawyers, and that the rule is broader than reasonably necessary to serve that interest. Accordingly, amended rule 7.05(b)(5) must be declared unconstitutional on its face.

**14. Prohibition on revealing the nature of the prospective client's legal problem on the outside of a written solicitation communication**

■ Plaintiffs profess a desire to distribute written communications which state the nature of a prospective client's legal problem (*e.g.,* "This letter relates to your recent arrest"), on the communication's envelope, or if the communication is a self-mailing brochure or pamphlet, on the outside of such brochure or pamphlet. Amended rule 7.05(b)(6) prohibits such communications. Plaintiffs argue that the rule violates their right to communicate truthful commercial speech, whereas defendants argue that the rule is necessary to protect prospective clients' privacy.

Morrison testified about several occurrences that demonstrate invasions of privacy that might occur in absence of this rule. In one instance, a bankruptcy lawyer mailed to a prospective client a post card that stated that his home had been posted for foreclosure. An older relative of the prospective client was living with the prospective client at the time the post card was delivered, and was distressed when he learned from the post card that the home was posted for foreclosure. In the second situation, a man was arrested for driving while intoxicated. At the time of his arrest, his wife was out of town. When she returned home, she learned of the event when she saw a solicitation letter from a lawyer referring to the "DWI" on its envelope.

The Supreme Court has determined that protection of consumer privacy is a substantial governmental interest. *Edenfield,* —— U.S. at ——, 113 S.Ct. at 1799 (citing *Ohra-*

---

**30.** Of course, neither the lawyer nor an employee of the lawyer may deliver the letter, as that conduct is prohibited by amended rule 7.03.

*lik,* 436 U.S. at 462, 98 S.Ct. at 1921–22). In the context of a challenge to a state rule prohibiting lawyers from mailing targeted solicitation letters, the Court recognized that the privacy invasion occurs "when the lawyer discovers the recipient's legal affairs, not when he confronts the recipient with the discovery." *Shapero,* 486 U.S. at 476, 108 S.Ct. at 1923. It cannot be said, however, that placing private information about the nature of one's legal problems on the outside of a mailing, where there is a likelihood that others will see such information, fails to raise legitimate privacy concerns. As the evidence presented at trial shows, a substantial risk exists that the privacy of consumers will be invaded in the absence of this rule. In addition, there does not appear to be a less restrictive means to protect consumers from the privacy invasions inherent in placing information relating to the nature of their legal problem on the outside of a mailing. Amended rule 7.05(b)(6), then, is a constitutional restriction on commercial speech.

### 15. Record Keeping

Amended rule 7.05(d) requires Texas lawyers to keep a copy of each written solicitation communication they distribute, as well as various information pertinent to such communication, for four years after the dissemination of the communication. Plaintiffs complain that this requirement is unduly burdensome.

The Supreme Court has recognized that states may impose reasonable regulations to minimize mistakes in written solicitation letters. *See Shapero,* 486 U.S. at 466, 108 S.Ct. at 1917–18. The requirement that lawyers keep copies of the solicitation communications allows the state to have a record of such communication if a grievance concerning the letter is filed, and thus the requirement furthers a legitimate state interest in a material way. Nor does it appear that the

record keeping required by the amended rules is in conflict with the requirement that commercial speech regulations "reasonably fit" the interest served by such regulation. Maintaining a copy of the communications and information pertinent thereto may be a burden, but it does not appear to be an unreasonable one. Amended rule 7.05(d) thus does not infringe the First Amendment's protection of commercial speech.

### 16. Filing Requirement

Amended rule 7.07 requires lawyers to file copies of their "advertisements in the public media," or "written solicitation communications" with the Review Committee of the state bar either in advance, or concurrent to, their distribution. *See* amended rule 7.07(a) & (b). The filing must include a fee, set by the Review Committee, "for the sole purpose of defraying the expense of enforcing the rules related to such" advertisements or solicitations. *See* amended rule 7.07(a)(2) & (b)(4). Amended rule 7.07(d) lists eight categories of advertisements or written solicitations communications that are exempted from the filing requirement.[31] If the Review Committee so desires, it may require a lawyer to submit information substantiating "statements or representations made or implied in any advertisement in the public media and/or written solicitation." *See* amended rule 7.07(e). The rule apparently presumes that the Review Committee will report any lawyer who has advertised in violation of the amended rules to the appropriate grievance committee of the state bar, but since the Review Committee has no enforcement powers, violations of the amended rules must be pursued through the normal grievance process. *See* amended rule 7.07 cmt. 2.

Amended rule 7.07(c) allows lawyers to obtain an advance advisory opinion from the Review Committee regarding the compliance of particular advertisements or solicitations

---

**31.** Plaintiffs contend the exemptions contained in amended rule 7.07(d) render this rule a content-based restriction on speech. These exemptions, however, are designed to eliminate from the filing requirement speech that is not likely to be false or deceptive. Thus, the exemptions merely narrow the applicability of the rule, and do not regulate content. Even if amended rule 7.07

were understood as a content-based regulation on commercial speech, it is not clear that the analysis would change. *See MD II Entertainment, Inc. v. City of Dallas, Texas,* 28 F.3d 492, 495 (5th Cir.1994) (noting debate as to which level of constitutional scrutiny should apply to content-based regulation of commercial speech).

with the Texas rules. In order to obtain the advance advisory opinion, a lawyer must submit his advertisement and/or solicitation, as well as the filing fee, at least thirty days in advance of its first dissemination. The Review Committee is required to complete its advisory opinion within twenty-five days of receiving the filing, unless it makes certain findings and informs the lawyer who filed the particular advertisement or solicitation of those findings in writing within the twenty-five day period. *See* amended rule 7.07 cmt. 5. If the Review Committee determines that the advertisement or solicitation is in compliance with the Texas rules, that finding is binding in any subsequent disciplinary hearing relating to that particular advertisement or solicitation, provided the lawyer has not deceived the Review Committee in some way. *See* amended rule 7.07(c). If the Review Committee finds that the advertisement or solicitation is not in compliance with the Texas rules, that finding is not binding in any subsequent disciplinary proceeding, but will be admissible evidence in such proceeding. *Id.*

Plaintiffs lodge an essentially two-prong attack on amended rule 7.07. First, they maintain that the filing requirement is an unduly burdensome restriction on commercial speech. Second, they contend that, despite the Review Committee's inability to enjoin or otherwise limit speech, the advance advisory opinion mechanism, and the Review Committee's power to request substantiation from advertising or soliciting lawyers, constitute a *de facto* prior restraint on speech.

**a. Is the filing requirement unduly burdensome?**

■ At trial, several of the individual plaintiffs testified that they felt amended rule 7.07 would require them to file every single solicitation letter they distributed. Newton stated the rule would require him to file all of his "nonidentical" solicitation letters. Weinstein, who testified that he mails approximately 48,000 solicitation letters a year, opined that the filing rule would greatly interfere with his ability to attract clients. The comments to amended rule 7.07, however, provide that only a representative sample of form letters, and a representative sample of their envelopes, must be filed. *See* amended rule 7.07 cmt. 3. Thus, the filing requirement is obviously not so heavy a burden as plaintiffs seemed to anticipate.

In addition, Weinstein's testimony concerning his misleading solicitation letter illustrates the need for a filing rule. Weinstein testified that he has mailed between 300,000 and 400,000 of the solicitation letters which contained the misleading statement referring to his tenure and experience in the Houston City Attorney's Office. Weinstein also testified that none of the recipients of these letters ever brought the misleading statement to his attention.

Clearly, if a lawyer is able to distribute 300,000 to 400,000 misleading solicitation letters without reprisal, the state bar's discernment of an enforcement problem is well-founded. Moreover, a filing system provides the state bar an effective oversight procedure to prevent consumer deception. One advantage of a filing system is that the state bar is not required to rely on consumers, who may not have enough information about the legal system in general, or a particular lawyer, to detect false or misleading advertising from lawyers. The state bar will not be forced to rely hereafter on consumers, to find deceptive advertising or misleading solicitation letters. Instead, the filing process will enable the state bar itself to winnow false or deceptive advertising from truthful advertising.

The Supreme Court has suggested that a filing system similar to that found in amended rule 7.07 might be a reasonable and effective mode of regulating deceptive advertising. In *Shapero*, the Court acknowledged that state bars may have difficulty regulating targeted, direct-mail solicitation letters if the letters are personalized to fit a particular recipient's legal problem. *Id.* at 476, 108 S.Ct. at 1923. While the Court found the regulatory difficulties to be of insufficient magnitude to warrant an outright ban on such letters, it suggested that the state might "regulate such abuses and minimize mistakes through far less restrictive and more precise means, the most obvious of which is to require a lawyer to file any solicitation letter with a state agency, giving

the State ample opportunity to supervise mailings and penalize actual abuses." *Id.* (citation omitted). The Supreme Court has recognized the efficacy of a filing system in other decisions as well. *See In re R.M.J.,* 455 U.S. at 206, 102 S.Ct. at 939 (noting that a filing requirement of "all general mailings" is less restrictive than an outright ban on such mailings); *Central Hudson Gas & Elec.,* 447 U.S. at 571 n. 13, 100 S.Ct. at 2354 n. 13 (suggesting that a system of "previewing advertising campaigns" might be an appropriate regulation of commercial speech). Hence, the filing system created by the amended rules is in conformity with the Supreme Court's intimations respecting the means by which states may constitutionally regulate commercial speech, and is not an unduly burdensome restriction of commercial speech.

Plaintiffs also contend that the filing fee is an overly burdensome requirement. Amended rule 7.07 grants the Review Committee the responsibility of determining the amount of the fee, one important proviso being that the fee must be set "for the sole purpose of defraying the expense of enforcing the rules." *See* amended rule 7.07(a)(2) & (b)(4). Morrison testified that the Review Committee has not set the filing fee, but that he expected it to approximate $75.00. Under these circumstances, plaintiffs' contention that the filing fee is unduly burdensome is too speculative to resolve. Presumably, however, a $75.00 filing fee, if such was necessary to defray the actual expense of enforcing the amended rules, would not be unduly burdensome. *See Cox v. New Hampshire,* 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941) (finding a licensing fee designed to defray the administrative cost associated with the supervision of parades was justified).

b. **Does amended rule 7.07 impose an unconstitutional prior restraint on speech?**

Plaintiffs contend that the combined workings of the optional advance opinion process, and the Review Committee's ability to request substantiation for claims made or implied in an advertisement or solicitation, will function as an unconstitutional prior restraint on lawyers' commercial speech. In this regard, plaintiffs argue that Texas lawyers will never advertise or distribute a solicitation letter without first seeking an advance advisory opinion from the Review Committee; and that if the Review Committee disapproves the advertisement or solicitation letter, or requests substantiation from the lawyer, lawyers will automatically defer to the Review Committee and not disseminate their advertisement or solicitation. Plaintiffs maintain, therefore, that the Review Committee's decisions to "disapprove" an advertisement or solicitation submitted through the advance opinion process, or to request substantiation concerning the submission, will, in effect, suppress speech. Since such suppression would allegedly occur without adequate procedural safeguards, plaintiffs insist that it amounts to an unconstitutional prior restraint on speech. *See Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965) (enunciating procedural safeguards necessary to sustain system of prior censorship of motion pictures).

Contrary to plaintiffs' arguments, defendants contend that nothing in amended rule 7.07 coerces lawyers to seek an advance advisory opinion prior to disseminating their advertisements or solicitations, and, in any event, a finding of "noncompliance" by the Review Committee is not binding and thus cannot restrain speech. Also, defendants maintain that the provision allowing the Review Committee to request substantiation is a reasonable procedure, since it merely allows the Review Committee to obtain the information necessary to make informed decisions as to whether a particular advertisement or solicitation is actually in violation of the Texas rules.

Laws that enable government officials to suppress speech prior to dissemination have been understood to tread more heavily upon First Amendment rights than do laws which impose punishment only after speech is spoken. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975) ("[A] free society prefers to punish the few who abuse

rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable."). Accordingly, any law imposing a prior restraint on speech bears "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963).

The boundaries of the prior restraint doctrine in the commercial speech area, however, are unclear. The Supreme Court has indicated that, because commercial expression is more sturdy and less likely to be "chilled" than other forms of expression, the prior restraint doctrine may not apply to commercial speech. *See State Bd. of Virginia Pharmacy,* 425 U.S. at 771–772 n. 24, 96 S.Ct. at 1830–31 n. 24 (noting that "greater objectivity and hardiness of commercial speech . . . may make inapplicable the prohibition against prior restraints"); *Central Hudson Gas & Electric Corp.,* 447 U.S. at 571 n. 13, 100 S.Ct. at 2354 n. 13 ("commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it"); *Zauderer,* 471 U.S. at 668 n. 13, 105 S.Ct. at 2291 n. 13 (Brennan, J., joined by Marshall, J., concurring in part, and dissenting in part) (observing that "traditional prior restraint principles do not fully apply to commercial speech"). This issue need not be inquired into here, because amended rule 7.07 cannot be understood as inflicting a prior restraint on speech.

In *Alexander v. United States,* —— U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), the Supreme Court considered whether a forfeiture order imposed upon a criminal defendant engaged in the "adult entertainment" business constituted a prior restraint on speech. The defendant was convicted on obscenity charges and on charges of violating the Racketeer Influenced and Corrupt Organizations Act. In addition to sentencing the defendant to a term of imprisonment and a fine, the district court ordered the defendant to forfeit "his wholesale and retail businesses (including all the assets of those businesses)

and almost $9 million in moneys acquired through racketeering activity." *Id.* at ——, 113 S.Ct. at 2770.

The defendant argued that the forfeiture order amounted to a prior restraint on speech in violation of the First Amendment, because it effectively shut down his business and thereby prevented him from engaging in "presumptively protected expression" in the future. *Id.* at —— – ——, 113 S.Ct. at 2770–71. The Supreme Court disagreed:

> The term prior restraint is used "to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984) (emphasis added). . . . The forfeiture order in this case imposes no legal impediment to—no prior restraint on—petitioner's ability to open an adult bookstore or otherwise engage in the production of and distribution of erotic materials; he just cannot finance these enterprises with assets derived from his prior racketeering offenses.

*Id.* at ——, 113 S.Ct. at 2771.

Just as the forfeiture order did not prevent the defendant in *Alexander* from communicating in the future, no provision of amended rule 7.07 empowers the Review Committee prospectively to enjoin, or otherwise forbid, a lawyer from advertising or soliciting in any manner the lawyer chooses. While the Review Committee may determine that a particular advertisement or solicitation communication submitted for an advance advisory opinion is not in compliance with the Texas rules, that finding is not binding on the submitting lawyer, and cannot prevent the lawyer from disseminating the advertisement or solicitation communication. Similarly, while the Review Committee has the ability to request substantiation for any claim made or implied in a lawyer's advertisement or solicitation communication, the Review Committee cannot order a lawyer to cease using the advertisement or solicitation. Simply put, the Review Committee does not have the power to impose a "legal impediment" to a lawyer's ability to speak commercially.

Plaintiffs concede that under the terms of amended rule 7.07, the Review Committee is not given the express power to forbid communications prior to their dissemination. *See* Pla.s' Posttrial Brief, at 28. Instead, plaintiffs maintain that amended rule 7.07 creates the type of "informal censorship" found to be an unconstitutional prior restraint in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

In *Bantam Books,* the Supreme Court reviewed the practices of a state commission that was charged with educating the public about "obscene, indecent, or impure publications," and was also responsible for recommending prosecution of all persons it found to be selling such materials. *Id.* at 59–60, 83 S.Ct. at 633–34. The commission itself had no power to prohibit book sellers or publishers from distributing books it found to be objectionable. The commission, instead, notified distributors and publishers that certain publications had been found "objectionable;" that a list of those publications had been provided to local law enforcement officials; and that cooperation from the distributor or publisher would obviate the need for prosecution. *Id.* at 61–63 & n. 5, 83 S.Ct. at 634–35 & n. 5. In response to the commission's warnings, publishers and distributors removed the referenced publications from circulation. *Id.*

The Supreme Court found the commission's practices to amount to an unconstitutional system of informal censorship:

> The Commission's operation is a form of effective state regulation superimposed upon the State's criminal regulation of obscenity and making such regulation largely unnecessary.... The Commission's practice ... provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter.

*Id.* at 69–70, 83 S.Ct. at 639. The Supreme Court was careful to point out, however, that not all "informal contacts" between government officials and book sellers amount to an unlawful prior restraint on speech: "[w]here such consultation is genuinely undertaken with the purpose of aiding the distributor to comply with such laws and avoid prosecution under them, it need not retard the full enjoyment of First Amendment freedoms." *Id.* at 72, 83 S.Ct. at 640.

Plaintiffs contend that the Review Committee's requests for substantiation or findings of "noncompliance" pursuant to amended rule 7.07 will have the same effect that the commission's warnings had in *Bantam Books,* that is, the suppression of speech without any possibility of judicial superintendence.

There are, however, significant differences between the commission's practice in *Bantam Books,* and the workings of the Review Committee under amended rule 7.07. First, the Review Committee's ability to issue findings of "noncompliance" is delimited by the requirement that lawyers voluntarily submit their advertisements or solicitation communications to the Review Committee.[32] If a lawyer does not submit his or her advertisement or solicitation, the Review Committee has no authority to issue an advisory opinion that the advertisement or solicitation is in violation of the Texas rules. Hence, any power the Review Committee has to "coerce" lawyers' speech through the opinion process is a direct result of a lawyer's choice to submit an advertisement or solicitation letter for advance screening. In contrast, the commission in *Bantam Books* actively sought out book sellers it found to be distributing "objectionable" materials, and the book sellers had no way to elude the commission.

Second, there is no indication that statements similar to those included in the warnings mailed by the commission in *Bantam Books*—that a particular communication has

---

**32.** Plaintiffs' assertion that the advance opinion process is, in effect, a mandatory requirement is unconvincing. The comments to amended rule 7.07 clearly state that the prescreening service is "purely optional." *See* amended rule 7.07 cmt. 4 ("No lawyer is required to obtain advance clearance of any advertisement or written solicitation communication from the State Bar."). While some lawyers may find it advisable to submit their advertisements of solicitations for an advance opinion because a finding of "compliance" is binding, the rule makes clear that the service is not mandatory.

been referred to enforcement officials and that cooperation will obviate the need for prosecution—will be included in the Review Committee's advance advisory opinions. In *Bantam Books,* the Supreme Court found that the commission went "far beyond advising the distributors of their legal rights and liabilities," *id.* at 72, 83 S.Ct. at 640, because the commission's warning letters were phrased "virtually as orders, and reasonably understood to be such by the distributor." *Id.* at 68, 83 S.Ct. at 638. No evidence has been presented here to show even a likelihood that the Review Committee will include coercive or intimidating statements in its advance advisory opinions. On the contrary, amended rule 7.07(c) appears to contemplate that the Review Committee will simply determine whether an advertisement or solicitation communication submitted for an advance advisory opinion complies with the Texas rules, and state the reasons for such finding. It appears, then, that the advance opinion process is "genuinely undertaken with the purpose of aiding [lawyers] to comply" with the Texas rules, *id.* at 72, 83 S.Ct. at 640, and is thus not a prior restraint on speech.

Similarly, plaintiffs' contention that any requests for substantiation from the Review Committee will result in the suppression of speech cannot be accepted. Unlike the warnings mailed to book distributors in *Bantam Books,* a request for substantiation does not expressly state that a particular communication has been found objectionable. At most, the request suggests that the Review Committee has doubts as to the accuracy of a statement or representation made or implied in an advertisement or solicitation. If lawyers know the statements or representations in their advertisements or solicitations can be substantiated, they are unlikely to remove the communication from circulation. Plaintiffs Adler, Bandy, and Newton testified that they could substantiate statements in their advertisements or solicitation letters with little difficulty. *See Shapero,* 486 U.S. at 477, 108 S.Ct. at 1924 (recognizing that state agencies might "require the lawyer to prove the truth of the fact stated (by supplying copies of the court documents or material that led the lawyer to the fact)").

The Review Committee consequently will not have the same power of "informal censorship" the commission had in *Bantam Books,* and amended rule 7.07 cannot be understood to grant the Review Committee the power to restrain speech prior to dissemination. This is not to say that a system of informal censorship akin to that in *Bantam Books* is unimaginable under amended rule 7.07. Certainly, it is possible that under the auspices of amended rule 7.07, the Review Committee could undertake a calculated scheme to intimidate lawyers into compliance or "cooperation," and thereby suppress speech prior to its being disseminated. The evidence presented in the instant action, however, fails to show a likelihood that the Review Committee will operate in this manner, and, therefore, plaintiffs' claim that amended rule 7.07 creates an unconstitutional system of prior restraint must be rejected.

### C. Overbreadth.

■ The overbreadth doctrine is normally invoked "to enable persons who are themselves unharmed by the defect in a statute nevertheless 'to challenge that statute on the ground that it may conceivably be applied to others, in situations not before the court.'" *Fox,* 492 U.S. at 484, 109 S.Ct. at 3029 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)). The Supreme Court, however, has held that the overbreadth doctrine does not apply in the commercial speech context, because commercial speech, bolstered by the demands of the market place, is "more hardy, less likely to be 'chilled,' and not in need of surrogate litigators." *Id.* at 481, 109 S.Ct. at 3035 (citing *Bates v. State Bar of Arizona,* 433 U.S. 350, 380–81, 97 S.Ct. 2691, 2707–08, 53 L.Ed.2d 810 (1977); *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 462 n. 20, 98 S.Ct. 1912, 1922 n. 20, 56 L.Ed.2d 444 (1978)); *see also Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192–93, 71 L.Ed.2d 362 (1982) (citing *Central Hudson Gas & Electric Corp.,* 447 U.S. at 565 n. 8, 100 S.Ct. at 2351 n. 8). As it has been determined that the amended rules only apply to commercial speech, plaintiffs' claims that the amended rules imper-

missibly regulate *noncommercial* speech must fail.

## D. Vagueness.

■ Plaintiffs assert that the undefined phrases "advertisement in the public media," "written solicitation communication," "unfair statement," and "the kind of information that has traditionally been included in [legal directories and legal newspapers]" used in the amended rules are unconstitutionally vague, in that these phrases lack sufficient clarity to apprise Texas lawyers what conduct may subject them to sanctions. As a matter of due process, a law is unconstitutionally vague, "when it (1) deprives citizens of any warnings that their conduct may be illegal and (2) invests law enforcement officers with on-the-spot legislative power." *Nash v. State of Texas,* 632 F.Supp. 951, 979 (E.D.Tex. 1986), *aff'd in part and rev'd on other grounds in part,* 848 F.2d 567 (5th Cir.1988); *see also Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926) (a law that is so indefinite that persons "of common intelligence must necessarily guess at its meaning and differ as to its application" is void on its face). The Supreme Court has explained the concerns sought to be addressed by the vagueness doctrine:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)).

Nevertheless, some flexibility exists in applying these guidelines, depending on the context of a particular statute or regulation. When drafting economic regulations, lawmakers generally are granted greater latitude in the level of ambiguity that will be tolerated under the vagueness doctrine. *See id.* at 498, 102 S.Ct. at 1193 ("economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." (footnotes omitted). Hence, the particular context of the amended rules—regulation impacting the professional advertising and solicitations of lawyers—is significant, because lawyers can be expected to rely on their heightened abilities of interpretation in attempting to conform their conduct to the amended rules. *See Howell v. State Bar of Texas,* 843 F.2d 205, 206 & 208 (5th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 531, 102 L.Ed.2d 563 (1988) (denying vagueness challenge to state bar rule which prohibited lawyers from "[e]ngag[ing] in conduct that is prejudicial to the administration of justice," in part because lawyers "have the benefit of guidance provided by case law, court rules and the lore of the profession") (internal quotations omitted).

The particular phrases challenged by plaintiffs cannot be considered unconstitutionally vague under these guidelines. The phrase "advertisements in the public media," and "written solicitation communications" are clear in context. They address those forms of communication that lawyers commonly use to distribute information that proposes a commercial transaction. Clarifying examples of "advertisements in the public media" and "written solicitation communications" are provided in the amended rules. The comments to amended rule 7.05 state that, "[t]his rule deals with written solicitations between a lawyer and a prospective client. Typical examples are letters or forms of correspondence addressed to a prospective client." *See* amended rule 7.05 cmt. 1. Amended rule 7.04(d) states that a lawyer "may advertise services in the public media, such as (but not

limited to) a telephone directory, legal directory, newspaper or other periodical, outdoor display, radio, or television."

It is of course possible that issues will arise concerning whether a particular mode of communication transpires in the "public media." For instance, testimony at trial revealed uncertainty as to whether communications traveling across computer networks, the so-called "internet," occur in the "public media." Morrison exhibited great puzzlement when trying to answer whether these communications are in the public media, and admitted that the drafters of the amended rules never considered the potentiality that the amended rules might be applied to such communications. He added, however, that he was unfamiliar with the "internet" and the manner in which it works. His unfamiliarity with the "internet" is not surprising. The availability of differing methods and mediums to exchange information is ever-expanding, perhaps faster today than at any other time. But, simply because a particular lawyer is unfamiliar with a new technology or its applications, does not mean lawyers in general will be unable to conform their professional conduct to the terms of a regulation implicating that technology.

The evidence presented at trial shows that lawyers accustomed to the particular permutation of the "internet" discussed in this action, Lexis Counsel Connect, would clearly understand that it is a public media. Lexis Counsel Connect provides "on-line information and communication services for lawyers." Plaintiffs' witness, Mark Obbie ("Obbie"), the president and chief executive officer of Lexis Counsel Connect, stated without reservation that communications occurring on his computer-network service occur in the "public media." Obbie testified that approximately 18,000 people have access to his computer network, and that in order to have access they have to subscribe to the service and pay a fee. Subscribers communicate with one another by "posting" messages on computer "bulletin boards," which the other subscribers can read, and, if they choose,

post a response.[33] Obbie analogized this computer network to a newspaper, in that access to information was available to subscribers. Hence, lawyers who advertise their services on this computer network would understand that they were "advertising in the public media." *See* Pla.s' Posttrial Brief, at 7 (communications on Lexis Counsel Connect "cannot seriously be considered anything other than advertisements in the public media").

In like manner, the phrases "unfair statement" and "the kind of information that has traditionally been included" are not unconstitutionally vague. "Unfair statement" is used in conjunction with the words "false," "fraudulent," "misleading," and "deceptive," *see* amended rules 7.03(a)(3), 7.05(a)(3) and is clear in context.

The phrase "the kind of information that has traditionally been included" in legal directories and legal newspapers refers to information that lawyers should be familiar with. If a particular lawyer is not familiar with what "has been traditionally included in such publications," that lawyer need only look to the comments of the rule, which spell out the type of information referred to: "information about the name, location, telephone numbers, and general availability of a lawyer to work on particular legal matters." *See* amended rule 7.04 cmt. 5. Accordingly, the phrases used in the amended rules are clear in context and are not unconstitutionally vague.

**E. Plaintiffs' claims that the amended rules should be declared unconstitutional *in toto*.**

■ Plaintiffs insist that the regulatory scheme created by the amended rules should be declared unconstitutional as a whole. In light of the foregoing analysis, however, this claim is untenable. It is evident that the bulk of the amended rules were designed to ensure truth in advertising, and the drafters of the amended rules strayed from that course in only a few instances. The amended rules undoubtedly amount to a comprehen-

---

**33.** Obbie also explained that subscribers could use Lexis Counsel Connect to send "electronic mail."

sive scheme, but it is found that the joint operation of the individually constitutional provisions of amended rules is not so burdensome as to unconstitutionally abridge the First Amendment's protection of commercial speech.

## VII. Equal Protection Analysis

■■■ Plaintiffs argue that several of the amended rules violate the Fourteenth Amendment's Equal Protection Clause. In this regard, plaintiffs contend that amended rule 7.03 violates the Equal Protection clause by discriminating between qualified nonprofit organizations and other organizations, since the rule allegedly allows qualified nonprofit organizations to communicate with their members through in-person or telephonic contact when other organizations are prohibited from doing so. Correspondingly, plaintiffs contend that amended rule 7.04(a) violates the Equal Protection clause by permitting lawyers with certain specialties (*e.g.*, patent attorneys, trademark attorneys) to advertise their specialties under less-restrictive regulations than lawyers in other specialties.

Plaintiffs fail to indicate what level of constitutional scrutiny should be applied to the amended rules under the Equal Protection clause. The United States Court of Appeals for the Fifth Circuit, however, has determined that equal protection challenges to laws implicating only commercial speech "give rise to an equal protection issue requiring only minimal scrutiny." *Dunagin v. City of Oxford, Miss.,* 718 F.2d 738, 753 (1983) (*en banc*), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 3554, 82 L.Ed.2d 855 (1984). Under this standard, "the classification challenged need only be rationally related to a legitimate state interest ... and is invalid only if wholly irrelevant to the achievement of the State's objective." *Id.* (internal quotations and citations omitted); *see also Greater New Orleans Broadcasting Ass'n v. United States,* 866 F.Supp. 975, 979 (E.D.La.1994) (applying this standard in "commercial speech equal protection cases"). As it has been determined that the amended rules regulate only commercial expression, the standard articulated by the Fifth Circuit in *Dunagin* is applicable to the

Equal Protection challenges brought by plaintiffs in the instant action.

Amended rule 7.03 and 7.04(a) easily pass constitutional muster under this deferential standard. The exemption contained in amended rule 7.03 for qualified nonprofit organizations is completely warranted, as it enables public interest lawyers to effectively communicate with the clients they serve. *Cf. In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). The evidence at trial clearly establishes that this provision of the amended rules serves a legitimate governmental interest.

The exemption in amended rule 7.04(a) is also justified. Testimony at trial revealed that the clients of "intellectual property lawyers" tend to be sophisticated persons who generally need less protection from false or misleading advertising. Moreover, lawyers admitted to practice before the United States Patent Office must meet licensing requirements designed to ensure their familiarity with that area of the law, and thus the drafters of the amended rules were justified in concluding that specialty advertising by patent attorneys poses less of a risk of false or misleading advertising than specialty advertising by other lawyers. Accordingly, it is found that the amended rules 7.03 and 7.04(a) serve legitimate state interests and are not "wholly irrelevant" to the achievement of those interests. Plaintiffs' Equal Protection claims must, therefore, fail.

## VIII. Claims that the Amended Rules Violate the Texas Constitution

■■■ Plaintiffs allege in both the first amended complaint and the joint final pretrial order that provisions of the amended rules violate the Texas Constitution. As previously discussed, TAC and the state bar addressed these issues in briefs and argument presented to the Supreme Court of Texas prior to the promulgation of the amended rules. *See* Def.s' Ex.s 253–258. Consequently, as set forth previously, the Supreme Court of Texas must be deemed to have finally settled the constitutionality of the amended rules by promulgating them, with revisions, after considering the arguments of the parties to this lawsuit. Plain-

tiffs' claims that the amended rules violate the Texas Constitution are, therefore, meritless. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (in civil actions where state law provides the rule of decision, the court must apply state law as "declared by its Legislature in a statute or by its highest court").

## IX. Relief

For the reasons set forth above, it has been determined that the bulk of the amended rules challenged by plaintiffs in this action do not unconstitutionally abridge plaintiffs' constitutional rights. Three rules, however, have been found to violate the First Amendment standards applicable to commercial speech. Amended rule 7.04(j), "the branch office rule," has been found to apply unconstitutionally to plaintiff Newton's conduct, and both amended rule 7.05(b)(4), banning written communications containing statements that the communication has been approved by the state bar, and amended rule 7.05(b)(5), prohibiting written communications sent in a manner requiring personal delivery, have been found facially unconstitutional.

Title 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, authorize the entry of declaratory and injunctive relief necessary to bring state agencies or officials into compliance with the Constitution. Although the practical effect of a declaratory judgment and an injunction may be virtually identical, a declaratory judgment is generally considered a less intrusive form of relief than an injunction. *See Steffel v. Thompson,* 415 U.S. 452, 467, 94 S.Ct. 1209, 1219–20, 39 L.Ed.2d 505 (1974) (a declaratory judgment is a "milder alternative to the injunction remedy" (quoting *Perez v. Ledesma,* 401 U.S. 82, 111, 91 S.Ct. 674, 690, 27 L.Ed.2d 701 (1971)).

Plaintiffs are entitled to declaratory relief, for the operation of amended rules 7.04(j), 7.05(b)(4), and 7.05(b)(5) have been found to be unconstitutional. However, "[w]here ... constitutional violations are found, but state officials have shown their readiness to meet constitutional requirements, the court should limit its initial response to a grant of declaratory relief." *Morrow v. Harwell,* 768 F.2d

619, 627 (5th Cir.1985); *see also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975) ("a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary"). In the instant action, there is no indication that defendants will fail to recognize and protect plaintiffs' constitutional rights as determined by this court, or that defendants will ignore the adjudication rendered herein. Accordingly, injunctive relief is not necessary, and only declaratory relief shall be granted.